560 So.2d 861 (1990)
SUCCESSION OF Melvyn J. THERIOT, et al., Plaintiff-Appellant,
v.
SOUTHERN PACIFIC TRANSPORTATION CO., et al., Defendant-Appellee.
No. 88-1164.
Court of Appeal of Louisiana, Third Circuit.
March 14, 1990.
Rehearing Denied April 23, 1990.
Writ Denied June 29, 1990.
*862 Allen A. McElroy, Jr., Berwick, for plaintiff-appellant.
Allen & Gooch, James H. Gibson, Lafayette, for intervenor-appellant.
Davidson, Meaux, Sonnier, McElligott & Swift, John E. McElligott, Jr., Lafayette, Haik & Minvielle, Julius W. Grubbs, New Iberia, Preis & Kraft, Laura K. Austin, Lafayette, for defendant-appellee.
Before DOMENGEAUX, C.J., and GUIDRY and YELVERTON, JJ.
YELVERTON, Judge.
This appeal arises out of an accident occurring when a car and a train collided at a railroad crossing near Duck Industries, Inc., in Iberia Parish. The driver of the car, Melvyn J. Theriot, was killed. Suit was brought by his widow, Carolyn O. Theriot, on behalf of the succession, on behalf of herself individually, and on behalf of their three minor children, against three defendants: Southern Pacific Transportation Company (SoPac); the State of Louisiana, through the Department of Transportation and Development (DOTD); and the Iberia Parish Council (Iberia Parish). National Union Fire Insurance Company (National Union), the worker's compensation carrier for deceased's employer, Duck Industries, Inc., intervened for reimbursement of funeral expenses, and weekly benefits paid and to be paid.
The trial was bifurcated. The jury first determined liability, returning a verdict reflecting findings that SoPac and the DOTD were free from fault, Iberia Parish was 51% at fault, and the deceased was 49% at fault. The jury then awarded the plaintiffs damages of $780,000. The trial judge, recognizing that, as a matter of law, the jury's verdict only affected the non-governmental defendants, made her own independent findings of fact with respect to the DOTD and Iberia Parish. The trial judge found, as the jury did, that the DOTD and SoPac were free from fault, and that Iberia Parish and the deceased were at fault. However, the trial judge disagreed with the jury as to the allocations of fault. The trial judge assessed 75% fault to the deceased and 25% to Iberia Parish. The trial judge agreed with the jury on damages, finding that the jury's awards of $370,000 for loss of earnings, support and maintenance, $10,000 for deceased's pre-death pain, $250,000 to deceased's wife for her non-pecuniary loss, and $50,000 to each of the deceased's three daughters for their non-pecuniary losses, were reasonable, and a judgment was signed for a total award of $780,000.
National Union's intervention claim was recognized. The trial judge awarded $44,205 *863 representing paid weekly compensation benefits, to be 100% reimbursed out of the amount recovered by the plaintiff for lost wages. In the same judgment the trial court awarded $750 for funeral charges, representing 25% of the $3,000 paid after deducting for deceased's fault.
From the trial court's judgment the plaintiffs and the intervenor appeal.

FACTS
On March 16, 1984, at approximately 4:00 p.m., Melvyn J. Theriot was leaving work, driving a car owned by his employer, Duck Industries, Inc. He had just left the Duck Industries premises, had turned on to Airport Boulevard, a parish road, and was headed east. Southern Pacific railroad runs in a north-south direction where it intersects with Airport Boulevard. When Theriot drove onto the railroad crossing, his car was struck on the passenger side by a SoPac freight train traveling north. The train pushed the car 1768 feet down the track before coming to a stop. Theriot was killed.
The crossing was marked with standard crossbuck signs. There were no automatic barricades or signal lights present. The crossing was less than 50 feet from La. Highway 182, which runs parallel to it on the east. Testimony established that a motorist approaching the crossing had a clear and unobstructed view down the track in the direction from which the train was coming.

LIABILITY OF SOPAC
Plaintiffs and intervenor contend that the jury erred by finding SoPac free from fault. They argue that the trial judge failed to properly instruct the jury on Southern Pacific's duty to install automatic safety warning devices.
We adopt and quote the trial judge's well written reasons explaining her finding that SoPac was not liable on the facts of this case:
"Duty of Southern Pacific Railroad Company (SoPac):
"The law is clear that SoPac had the duty to erect and maintain a `Railroad Cross Buck' sign at the crossing. LSA R.S. 32:169. It is uncontroverted that `crossbucks' were in place at the railroadhighway intersection of Airport Boulevard, and no allegations were made that such `crossbucks' were in any way incorrectly installed. Other than `crossbucks', the railroad's duty to install further safety devices rises in proportion to the increasing dangerousness of the crossing, as determined by an approaching vehicle's ability to see the oncoming train. This concept can be referred to as the `dangerous trap' doctrine and is summarized as follows:
If a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning or providing signaling devices, etc. Hebert v. Missouri Pacific Railroad Co., 366 So.2d 608 (La. App. 3rd Cir. 1978), writ den. 369 So.2d 153 (La.1979), citing Glisson v. Missouri Pacific Railroad Co., 158 So.2d 875 (La. App. 3rd Cir. 1963).
"In Hebert v. Missouri Pacific Railroad Co., supra, while the Court of Appeal found no `dangerous trap' which would have thus excused any contributory negligence on the part of plaintiff, it did find numerous obstructions to view, resulting in there being only half of the clear `sight distance' required by the Bureau of Public Records. Hebert, at 611. Like Hebert, the record in this case contains voluminous evidence concerning the nature of the crossing. Unlike Hebert, however, plaintiffs have not proven the existence of unusual obstructions which would have hampered Melvyn Theriot's ability to see the oncoming train. In fact, plaintiff's grade crossing safety analysis expert, Dr. Kenneth Heatherington, testified that a motorist approaching the crossing has a `clear and *864 unobstructed view' down the track. This testimony is corroborated by SoPac's photographic exhibits SP-2, 3, 4, 5, 15, 17, and 18. Thus SoPac's duty to provide adequate warning devices was not breached, since under the facts of this case SoPac was not obligated to provide any additional warning devices other than the required `crossbucks'.
"Plaintiffs allege that SoPac was negligent in improperly maintaining the Airport Boulevard crossing. SoPac's duty to keep the crossing in good condition extends to the portion of the street lying between the rails of the tracks and for a distance of two feet on the outside of the rail. LSA R.S. 45:323(A). While there may have been minor bumps and rough spots on and just outside of the tracks, this court finds that they were not of such severity as to constitute a breach of the railroad company's duty to maintain the track, nor were they of such magnitude as to be in any way a cause, or a contributing factor of the accident in question.
"At trial plaintiffs introduced into evidence applicable portions of the Manual on Uniform Traffic Control Devices for the proposition that SoPac had joint responsibility with the other defendants for the installation of grade crossing safety control devices. The Manual on Uniform Traffic Control Devices provides, in part:
... This requires joint responsibility in the traffic control function between the public agency and the railroad. The determination of need and selection of devices at a grade crossing is made by the public agency with jurisdictional authority...
LSA R.S. 32:235(A) authorizes the Department of Transportation to adopt a manual and specifications for a uniform system of traffic control devices. LSA R.S. 32:235(B) requires local municipal and parish authorities in their respective jurisdictions to place and maintain such traffic control devices as they deem necessary; the traffic control devices must conform to the department's manual or specifications. Noncompliance with the manual is not negligence per se. Rather, the injured motorist must prove that the authority acted unreasonably under the circumstances. Hatcher v. State Through Department of Transportation, 467 So.2d 584 (La.App. 3rd Cir. 1985).
"Legally, SoPac did not have control, other than of the track itself, of the Airport Boulevard railroad crossing. In 1949, the Texas and New Orleans Railroad Company, predecessor in title to SoPac, granted to the Parish of Iberia a right of way to construct a public road, i.e. Airport Boulevard, over the company's property, reserving to itself and its successors only the rights to maintain and operate its existing railroad track and appurtenances, and to construct additional railroad tracks. Thus control of the road clearly rests with the Parish of Iberia.
"Even assuming the Manual on Uniform Traffic Control Devices applies, and joint responsibility lies between SoPac and the Parish of Iberia in, as the manual states, `the traffic control function,' this court does not find that SoPac breached its duty or neglected its responsibility.
"On July 28, 1981, the Iberia Parish Police Jury, without stating reasons, adopted a resolution requesting that SoPac install signal lights at the intersection of Airport Boulevard and the SoPac railroad tracks. Exhibit P-22. SoPac responded on August 10, 1981, by letter from R.H. Patterson, Public Projects Engineer, stating that Patterson was handling the matter with the La. DOTD, and that the Parish would be advised of the results. Exhibit P-24. On August 18, 1981 DOTD informed the Police Jury that the subject crossing was located on a parish road, and that DOTD had no funds available for the work. Exhibit P-25. Thereafter, on October 1, 1982, an estimate of the cost of performing surface and protection improvements at the crossing was submitted by SoPac to the Iberia Parish Police Jury, with the request `Please Advise.' Exhibit P-26. No response was forthcoming. Nothing was done at the Airport Boulevard railroad crossing. This court finds that SoPac's conduct was reasonable under the circumstances.
"Lastly, regarding the duty SoPac owed to plaintiffs, no evidence was presented to *865 show that SoPac was negligent in the operation of the train involved in the accident. Although plaintiffs contended that the train should have reduced speed to considerably below the speed limit in view of the history of accidents at the crossing, plaintiffs' own expert, Dr. Heatherington, stated that such procedure is not practical. And he further testified that since trains cannot leave the track, avoidance of accidents is in the hands of automobile traffic rather than train traffic. Thus, this Court finds that SoPac breached none of its duties owed to plaintiffs' decedent Melvyn J. Theriot and assigns no fault to that defendant."
We find no error in the trial judge's ruling denying the requested jury charge nor do we find manifest error in the jury's finding of no liability as to Southern Pacific. There was evidence that there were no obstructions to view, and that the train's whistle was blowing and its headlight was shining as it approached the crossing.

LIABILITY OF DOTD
The plaintiffs and intervenor contend that the trial judge erred in finding the DOTD free from fault. They argue that the DOTD undertook responsibility for marking the crossing and that its failure to properly mark the crossing with automatic warning devices, under circumstances where the DOTD had federal funds available for that use, was a breach of its duty.
The trial judge found that the road on which the accident occurred, Airport Boulevard, was a parish road, and that the existence of federal funding created no duty on the part of the DOTD to provide automatic warning devices on non-state roads where the state had not first undertaken the responsibility of marking that specific crossing.
Where federal funding is allocated to the State to make railroad grade crossings, there is no duty on the State to provide protective devices at railroad crossings on non-state roads. Lague v. St. Charles Parish, 444 So.2d 742 (La.App. 5th Cir. 1984). In Arnold v. Illinois Central Gulf Railroad, 501 So.2d 778 (La.App. 1st Cir. 1986), the court imposed liability on the State where federal funding was available, but in that case the DOTD had undertaken responsibility for marking and crossing on the non-state road where the accident occurred.
Accordingly, we find no error in the trial judge's refusal to impose a duty in this case, because the DOTD had never undertaken responsibility for marking the crossing where Theriot was killed.

LIABILITY OF IBERIA PARISH
The trial judge found that Iberia Parish breached its duty to exercise reasonable care to keep public ways in such a condition that travelers who are prudent and ordinarily careful will not be exposed to injury. See Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975).
Since all that is disputed on this appeal with respect to Iberia Parish is the percentage of fault allocated to it, and not the finding of liability, we will discuss the allocation of fault in a section below dealing with the apportionment of fault.

LIABILITY OF DECEASED
The plaintiffs and intervenor contend that the trial judge and jury erred in finding the deceased at fault. Further, they argue that the trial judge erred in failing to instruct the jury on the presumption that a motorist will obey a traffic control signal if it had been in place, and on the doctrine of "momentary inattentiveness".
The trial judge had this to say about the negligence of the deceased:
"Melvyn J. Theriot:
"As a motorist approaching a railroad crossing, Melvyn J. Theriot had a duty to use his sense of sight and hearing for possible oncoming trains before traversing the crossing.

* * *
"He was burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in *866 law to have seen and heard what he could have seen and heard.

* * *
"Several eye-witnesses to the accident testified at the trial. Herman Bass was in the yard of Duck Industries when he saw the train approaching; he also saw Theriot approaching the track. Bass testified that he thought Theriot would stop before crossing because he saw the brake light come on. He also stated that there were no competing noises, the weather was good, and there was good visibility. He further testified that he thought Theriot was `looking down as if turning on the radio or airconditioner.' Kathy Kisco, a witness although not actually an eye-witness to the accident, was approaching the track in her automobile a few moments before Mr. Theriot. She testified that as she approached, stopped, and continued over the track, she could clearly see the train and hear the train whistle, all in spite of the fact that her airconditioner and stereo were on. As she turned onto Hwy. 182 she heard but did not see the impact. And Larry Melancon, the fireman and engineer aboard the train at the time of the accident, saw the Theriot vehicle slowly approaching the track and, like Herman Bass, thought it would stop. He also saw Mr. Theriot looking down, `like he was reading something off the front seat.' The only controverting testimony regarding Mr. Theriot's actions, if it may be so characterized, was that of Amos Gary, by deposition. Mr. Gary was traveling on Hwy. 182 across the track from Mr. Theriot's location. He stated that Mr. Theriot did not appear to reduce his speed and appeared to be staring straight ahead. However, he viewed the scene from a vantage point which he admits' ... was not that close.'
"In light of the above accounts of the accident, and in consideration of the above described unobstructed view down the track at the crossing, the court finds that Melvyn J. Theriot breached his duty to see and hear what he should have seen and heard. Such a breach was a direct cause of Theriot's accident and death, despite the fact that this court has previously found that the dangerous condition of Airport Boulevard was, in fact, a contributing cause of Theriot's accident. Consequently, the court finds plaintiffs' decedent to be negligent and must now apportion fault between the parties. Mart v. Hill, [505 So.2d 1120 (La.1987) ]."
We find no manifest error on the part of the trier of fact's finding that the deceased was at fault. Furthermore, we find no error in the trial judge refusing to instruct the jury on the presumption that a motorist will obey a traffic control signal if it is in place. In the circumstances of this case, such an instruction would have served no purpose, inasmuch as the jury was well aware that the deceased failed to obey the traffic control device that was in place, the crossbuck sign. Also, we do not regard the doctrine of momentary inattentiveness as being applicable here. It is doubtful whether the doctrine has any further utility in this State, since comparative negligence has become the law. Be that as it may, however, the doctrine has never been applied to excuse the actions of an automobile driver in the presence of a clearly visible oncoming freight train whose whistle is blowing and headlamp is shining.

APPORTIONMENT OF FAULT
The plaintiffs and intervenor contend that the trial judge erred in her apportionment of fault. The jury found the deceased 49% at fault, and the trial judge assessed him with 75% of the fault, finding Iberia Parish only 25% at fault.
In a bifurcated trial, where the jury and trial judge reach conflicting findings of fact and there is an appeal, the manifest error rule is inapplicable and the court of appeal must decide which decision is more reasonable after a careful examination of the record. Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3rd Cir. 1987), writ denied, 522 So.2d 562 (La. 1988).
In determining the percentages of fault, there must be considered both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. Watson v. State Farm Fire and Cas. Ins. *867 Co., 469 So.2d 967 (La.1985). In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Id.
After considering these factors, we find that the majority of fault must rest with the deceased. There was a direct causal relation in the negligence of the deceased going on the railroad crossing not aware of the oncoming train where his vision was not obstructed. The failure of Iberia Parish to provide additional warning devices contributed to the accident but to a lesser degree.
Iberia Parish and the deceased were both aware of the danger. Iberia Parish had knowledge of previous accidents at the crossing and had passed a resolution to install additional safety devices. The deceased worked near the crossing, knew of its existence, and knew that he had to cross the railroad soon after leaving work each day. Theriot's substandard conduct was in failing to see the approaching train. Iberia Parish's substandard conduct lay in failing to install additional safety devices for the protection, not for the traveling public in general, but only for the relatively few drivers who are inattentive.
After weighing these and the other factors listed in Watson, we find that the trial judge's assessment of fault is more reasonable.

QUANTUM
Plaintiffs contend that the trial judge and jury abused their discretion in awarding inadequate damages, specifically in the awards of only $50,000 to each of the deceased's three children. Furthermore, they argue that the award of $370,000 for loss of support was abusively inadequate where the only economist to testify opined that the total loss of support was $504,681.
After reviewing the record in accordance with the standards set forth in La.C.C. art. 2324.1, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), and Reck v. Stevens, 373 So.2d 498 (La.1979), we find no abuse of discretion in the award as a whole. Further, we find no error in the award for loss of support. The trial judge and jury obviously weighed the expert witness' testimony on direct examination against his testimony on cross-examination where he calculated the loss at an amount less than what was eventually awarded.

WORKER'S COMPENSATION INTERVENTION
The trial judge in her original judgment decreed that the recovery of the worker's compensation intervenor was not to be subject to the percentage of fault assigned to the plaintiffs' deceased. By a subsequent judgment, the trial court adhered to this ruling insofar as it applied to the recovery of worker's compensation benefits, but changed the ruling so as to limit the recovery of the intervenor for burial expenses to what the plaintiffs could recover for burial expenses. Thus, the final judgment allowed the intervenor to recover all of the worker's compensation benefits of $44,205 that had been paid, but only allowed recovery of burial expenses in the amount of $750, which was what the plaintiffs received after deducting 75% of the total amount of burial expenses of $3,000, which was paid by the intervenor.
Both the plaintiffs and the intervenor appeal these rulings. Plaintiffs contend that the trial judge erred by not reducing National Union's recovery for worker's compensation benefits in proportion to the deceased's fault. National Union contends that the trial judge erred by reducing its recovery for reimbursement of funeral expenses paid by it in proportion to the deceased's fault.
LSA-R.S. 23:1101, as amended in 1985, provides that the negligence of the injured employee is to be considered in determining the amount of reimbursement to which the *868 employer is entitled from the third party tortfeasor. In Vallere v. Nicor Exploration Co., 512 So.2d 514 (La.App. 3rd Cir. 1987), we held that the 1985 amendment was substantive in nature and should not be applied retroactively. We were also of the opinion that LSA-R.S. 23:1101 as applied before the 1985 amendment entitled the worker's compensation intervenor to full reimbursement without regard to fault attributable to the injured employee. In Vallere we did not allow a reduction of the intervenor's award by the percentage of fault of the injured employee.
Since the Vallere decision, other circuits have reached a contrary result. See Robertson v. Popeye's Famous Fried Chicken, 524 So.2d 97 (La.App. 4th Cir.1988), writ denied 526 So.2d 802 (1988); Chatelain v. Project Square 221, 505 So.2d 177 (La.App. 4th Cir.1987), writ denied 508 So.2d 71 (1987); and Scott v. Barclay's American Leasing Service, 506 So.2d 823 (La.App. 1st Cir.1987), writ denied 508 So.2d 88 (1987). These courts reasoned that it was the adoption of comparative negligence in 1979 that required the worker's compensation reimbursement claim to be reduced by the percentage of fault attributable to the employee, and not the 1985 amendment to LSA-R.S. 23:1101.
After reconsideration of the issue in the light of these cases, we believe that the rationale employed by these circuits is correct, and we now adopt it. Accordingly, we hold that National Union's reimbursement claim be reduced by the percentage of decedent's fault with respect to both compensation benefits and funeral expenses.
For the above and foregoing reasons the trial court's judgment is amended to decrease National Union's recovery for weekly compensation benefits paid to 25% of the total amounts paid. In all other respects the judgment below is affirmed.
AMENDED AND AFFIRMED.