694 So.2d 1101 (1997)
Linda Plaisance, wife of/and August J. GOODWYNE, Plaintiffs-Appellants,
v.
PEOPLE'S MOSS GIN, INC.; Jeff Bernhard Grain, Inc.; Clifford J. Morgan; Ranger Insurance Company and Missouri Pacific Railroad Company, d/b/a Union Pacific Railroad Company, Defendants-Appellees.
No. 96-1340.
Court of Appeal of Louisiana, Third Circuit.
April 30, 1997.
Rehearing Denied June 30, 1997.
*1103 Al Jules Mendoza, Harvey, for Linda Plaisance, et al.
Robert M. Johnston, New Orleans, for People's Moss Gin, Inc., et al.
Ronald J. Fiorenza, Alexandria, Harry Alston Johnson, III, for Missouri Pacific Railroad Co., etc.
Before THIBODEAUX, PETERS and SULLIVAN, JJ.
THIBODEAUX, Judge.
Plaintiff, August Goodwyne, was injured when the train aboard which he was working collided with a vehicle driven by Clifford Morgan, an employee of People's Moss Gin, Inc. Mr. Goodwyne filed suit against his railroad-employer, Missouri Pacific Railroad Company (MOPAC); Clifford Morgan; and People's Moss Gin, Inc., seeking damages and lost wages. After a trial on the merits, the jury apportioned fault among all three parties in the following proportions: Mr. Goodwyne - 20%, MOPAC - 30%, and 50% to Mr. Morgan and People's Moss Gin, Inc. It awarded general damages of $220,000.00 and lost earnings of $115,000.00. Mr. Goodwyne appeals his assignment of fault and the amount of the lost earnings award. MOPAC appeals its assignment of fault.
We reverse the jury's apportionment of fault and find Mr. Goodwyne and MOPAC to be blameless, and we amend the lost earnings award to $553,055.00 and the loss of fringe benefits award to $65,648.00.

I.

ISSUES
The issues presented for review in this appeal are the following:
(1) whether the trial court was manifestly erroneous in apportioning 20% fault to Mr. Goodwyne, 30% fault to MOPAC and 50% to Mr. Morgan;
(2) whether the trial court abused its discretion in awarding $115,000.00 to Mr. Goodwyne for lost wages and loss of fringe benefits.

II.

FACTS
On April 19, 1993, a collision occurred between a vehicle attempting to cross the tracks at East Pine Street in Bunkie, Louisiana, and a moving Missouri Pacific Railroad Company (MOPAC) train. Driving the vehicle crossing the tracks was Clifford Morgan, an employee of People's Moss Gin, Inc. On board the train were the train's crew, engineer Bobby Taylor, conductor Nicholas Antunica, and brakeman August Goodwyne. The front of the train struck the rear end of the truck. The force of the impact threw Mr. Goodwyne off of his chair, and onto the floor. No injuries were reported to the police or to MOPAC the day of the accident. Mr. Goodwyne subsequently, however, developed pain in his back, buttocks, and legs. He filed suit against MOPAC and Mr. Morgan to recover for the damages he sustained following the collision.
The train was traveling at a speed of forty miles per hour. Mr. Morgan testified that he stopped his vehicle upon reaching the tracks of the railroad crossing. Not seeing or hearing any train approaching, he proceeded to cross the tracks. Mr. Morgan had an unobstructed view down the tracks. It was not until on the main track and just before the impact, that Mr. Morgan realized that the *1104 train was approaching. He attempted to increase his speed when he heard the train's whistle, but the train struck the rear end of his vehicle in spite of his attempt and the engineer's activation of the emergency brake.
As a result of the injuries Mr. Goodwyne sustained because of the collision, he was forced to leave his position with MOPAC, a position he had held for twenty of his fifty-one years. He was seen and treated by several doctors. Dr. Carlos Gorbitz diagnosed Mr. Goodwyne with a herniated disc and placed physical restrictions on him. Mr. Goodwyne could no longer engage in heavy labor or any labor which required repetitive bending, crouching, climbing or lifting objects heavier than twenty-five pounds.
With such restrictions, vocational evaluation specialist, Bobby Roberts, concluded that Mr. Goodwyne would be forced to work at a minimum wage job, which would mean a considerable cut in pay and benefits. Mr. Goodwyne did not make any attempt to find a new job after leaving MOPAC.
The only economist called to testify in the trial was Dr. Randy Rice. Dr. Rice's analysis determined that Mr. Goodwyne had a work life expectancy of 14.73 years. His calculations indicated that Mr. Goodwyne sustained a loss of past wages in the amount of $115,080.00. Furthermore, he concluded by using the annual income figure of a minimum wage salary that Mr. Goodwyne's future loss of earnings impairment would be $437,975.00. These two figures equal a total loss of past and future earnings of $553,055.00.

III.

LAW AND DISCUSSION

Liability of the Parties
The jury apportioned 50% of the fault in this accident to Mr. Morgan, 30% to MOPAC, and 20% to Mr. Goodwyne. Appellants Goodwyne and MOPAC individually assert that the jury's apportionment of fault is manifestly erroneous. Mr. Goodwyne argues that he owed no duty to activate the emergency braking system and is free from fault. MOPAC likewise asserts that it is free from fault in this collision, having taken the appropriate preventive measures.
Apportionment of fault is a factual question, and some deference should be given to the fact finder's determinations. Clement v. Frey, 95-1119, 95-1163 (La.1/16/96); 666 So.2d 607. In this regard, we must consider both the nature of the conduct of each party and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire & Cas. Ins. Co., 469 So.2d 967 (La.1985). If the appellate court finds an apportionment of fault that is clearly wrong, it should adjust the award to the extent of lowering or raising it to the highest or lowest point respectively that is reasonably within the trial court's discretion. Id. Because issues of negligence and apportionment of fault are so closely intertwined, our analysis of the latter will be subsumed in the former.
A determination of negligence depends on five factors: first, that the defendant had a duty to conform his conduct to a specific standard; second, that the defendant failed to conform his conduct to the appropriate standard; third, that the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; fourth, that the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and fifth, that the plaintiff sustained actual damages. Roberts v. Benoit, 605 So.2d 1032 (La. 1992). As liability for this train collision was apportioned among Mr. Morgan, MOPAC, and Mr. Goodwyne, we must address each party's actions in light of the circumstances surrounding the collision.
There is ample statutory and jurisprudential authority imposing on motorists the duty to yield to an oncoming train. Generally applicable is La.R.S. 32:175(A), which states in pertinent part that a motorist approaching a railroad crossing must, depending on the circumstances, slow down or stop if necessary and "shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed." Mr. Morgan did stop at the tracks but testified that since he did not see or hear a train approaching, he proceeded to cross the railroad crossing. Witnesses testified, however, *1105 that there were no visual obstructions of the tracks from Mr. Morgan's vantage point which could have prevented his view of the oncoming train. In any event, even if the signals were not given, the train was plainly visible and in close proximity to the crossing. See La.R.S. 32:171(A)(4).
Louisiana Revised Statute 32:171 further underscores a motorist's affirmative duty to yield to crossing trains. That statute states that when a train provides the statutorily required signals and is approaching within nine hundred feet of the highway crossing, the motorist is required to stop and not proceed to cross the tracks until certain he or she may do so safely. The train's engineer, Bobby Taylor, testified that he activated the train's whistle, bell and horn in order to notify Mr. Morgan of the train's approach. Although Mr. Morgan testified that he did not hear the train's warning signals until just prior to the impact, we note the jurisprudential tenet that positive and credible testimony attesting to a train's use of warning signals prevails over contrary testimony. Lagrange v. Missouri Pac. R.R. Co., 503 So.2d 1158 (La.App. 3 Cir.1987).
In Succession of Theriot v. Southern Pacific Transportation Co., 560 So.2d 861 (La. App. 3 Cir.), writs denied, 565 So.2d 451, 453, 454 (La.1990), a motorist was killed when a train collided with his car as he crossed the tracks. Testimony supported a finding that there were no visual obstructions impeding the motorist's view of the tracks or train. Id. The trial court found, and this court affirmed, that the motorist was solely liable due to his failure to yield. Id. Deferring to the trial court's reasoning, this court decided that the motorist had a duty to see and hear that which could be seen and heard and was presumed to have done so. Id.
Similarly, in Healy v. National Railroad Corp. (Amtrak), 613 So.2d 1117 (La.App. 5 Cir.), writ denied, 616 So.2d 709 (La.1993), the court of appeal affirmed the trial court's judgment that the motorist was solely liable for the collision of his vehicle and an oncoming train. It was found that the cause-in-fact of the collision was the motorist's failure to see the oncoming train or heed the train's activated warning signals. Id. Evidence indicated that the approach ramp to the tracks provided ample space for a motorist to stop before traversing the tracks. Id. In spite of the ramp, the motorist traveled through the crossing, compelling the approaching train's engineer to activate the emergency brake although the train's proximity to the vehicle made avoiding a collision impossible. Id.
It is widely accepted that a train engineer has the right to presume that a motorist will remove his or her automobile from any danger of impact with the train when warning signals are given, and only when those warning signals go unheeded should the engineer attempt to stop the train. Wheat v. New Orleans & N.E. R.R. Co., 245 La. 1099, 163 So.2d 65 (1964). Relying on this presumption, the train engineer in this case acted reasonably and prudently. Approaching the town of Bunkie, Mr. Taylor reduced the train's speed to forty miles per hour and activated the warning signals according to regulation. Mr. Taylor further testified that upon seeing Mr. Morgan's truck in the train's path, he activated the emergency brake. It is the uncontroverted testimony of expert Gary Wolf that in order for the train to have avoided the collision, its engineer would have needed to activate the emergency brake at 900 feet, which was impossible in this case since Mr. Taylor did not become aware of Mr. Morgan's presence on the tracks until just prior to the impact.
Mr. Morgan argues that Mr. Goodwyne had an affirmative duty to activate the emergency brake system to avoid the collision. To bolster the argument, he refers to MOPAC's general code of operating rules, section 106, which states, "[w]hen the conductor or engineer fails to take action to stop the train and emergency requires, other crew members must take immediate action to stop the train." Theoretically, this statute appears to impose a duty, but practically, it is functionally meaningless. In his twenty years of employment with MOPAC, Mr. Goodwyne never once activated the emergency brake. Furthermore, MOPAC never trained Mr. Goodwyne to use the emergency brake. His duties focused on performing physical tasks such as line switching and setting out cars.
*1106 Mr. Taylor testified that activating the emergency brake system is within the discretion of the engineer. Additionally, it was the uncontradicted expert testimony of Mr. Wolf that the activation of the emergency brake is a judgment call of the engineer, not the brakeman. He went on to state that the decision to activate the emergency brake is a very serious one that is to be made after all factors are weighed. Activating the emergency brake could avoid a collision, but could also culminate in a train derailment, endangering the lives of the crew and those people or things situated near the tracks. In light of the magnitude of the decision to activate the emergency brake as well as the possible hazardous ramifications, we find that Mr. Goodwyne did not reasonably owe a duty to activate the emergency brake in this situation. His lack of training and knowledge regarding the use of the emergency brake system did not qualify him for the grave task that appellees suggest he should have performed.
In this case, there was no visual obstruction impeding a clear view of the approaching train. Testimonies of both the train crew and experts indicate that the train was traveling at forty miles per hour as required by law. Furthermore, testimony indicates that the statutorily-required warning signals were activated on the train as it approached the railroad crossing. It is also noteworthy that Mr. Morgan failed to yield to the oncoming train even after having stopped his truck before proceeding across the tracks. Concerning the activation of the emergency brake, we note that Mr. Taylor did activate it upon becoming aware of Mr. Morgan's presence on the tracks.
In light of these facts, relevant statutes, and factually-parallel jurisprudence, we conclude that MOPAC did not breach any duty owed. We further find that Mr. Goodwyne did not owe a duty. The sole cause-in-fact of the April 19, 1993 accident was Mr. Morgan's failure to yield to the oncoming train. He owed a duty to yield. Proceeding across the tracks when he had the opportunity and vantage point to hear and see the train was a breach of that duty. That breach of duty was the only cause of the collision and Mr. Goodwyne's subsequent injuries. It was Mr. Morgan, not MOPAC and Mr. Goodwyne, who had the opportunity to avoid the collision. We reverse the trial court's judgment and assess 100% liability to Mr. Morgan.

Loss of Earnings Award
The jury awarded Mr. Goodwyne $115,000.00 for his loss of earnings. He appeals that award, claiming that the jury abused its discretion in that the award seemingly only provides for past lost wages and neglects future lost wages. It is well settled that before an appellate court can disturb a quantum award, it must be determined that the record does not support the trier of fact's findings. Veazey v. State Farm Mut. Auto Ins., 587 So.2d 5 (La.App. 3 Cir.1991). There is no exact formula to determine future lost wages, but the trial court is guided by the tenet that the award must be based on sound discretion and fairness to all parties involved without unduly burdening any particular party. Freeman v. Harold Dickey Transp. Inc., 467 So.2d 194 (La.App. 3 Cir. 1985). Jurisprudence also carves out the following factors for the trial court to follow in determining lost wages awards: the injured party's age, life expectancy, work life expectancy, any discount rate and inflation factor which may be applicable, the annual rate increase, probable future earning capacity, and the loss of future earning ability and capacity. Id. We find that the record does not reasonably support the jury's award to Mr. Goodwyne and accordingly increase it to provide for future earning capacity.
Dr. Gorbitz testified that due to Mr. Goodwyne's injuries, he could no longer work as a brakeman and would be severely limited in what jobs he could perform. Vocational evaluation specialist, Bobby Roberts, testified that Mr. Goodwyne, being physically limited, could only do sedentary work and cited jobs that pay minimum wage. He further testified that such jobs do not provide employees with benefits. It was the uncontradicted testimony of expert economist, Dr. Randy Rice, that without having sustained injuries, fifty-one-year-old Mr. Goodwyne was expected to work until age sixty-six; Mr. Goodwyne testified that at age 66, he could have retired from MOPAC with full benefits. According *1107 to his calculations, Dr. Rice determined that Mr. Goodwyne's total wage loss was $553,055.00 if he obtained a minimum wage job.
Seemingly, the jury did not accord great weight to Dr. Rice's expert testimony. The end result of the jury's rejection thereof is a woefully inadequate award which is not reflective of the record. Although we owe great deference to the findings of the trial court, we respectfully note that we are not bound to affirm the trier of fact's arbitrary rejection of sound, uncontroverted testimony. Butler v. Zapata Haynie Corp., 92-71 (La. App. 3 Cir. 2/23/94); 633 So.2d 1274, writ granted in part and denied in part, 94-1171 (La.7/5/94); 639 So.2d 1186, and cert. denied, 513 U.S. 1017, 115 S.Ct. 579, 130 L.Ed.2d 494 (1994). The following language cited in Butler articulates this idea:
[t]he principles of appellate review do not require an appellate court to affirm the trier of fact's refusal to accept as credible uncontradicted testimony or greatly preponderant objectively-corroborated testimony where the record indicates no sound reason for its rejection and where the factual finding itself has been reached by overlooking applicable legal principles.
Id. at 1279, quoting Dugas v. Fontenot Motors, Inc., 510 So.2d 1374, 1376 (La.App. 3 Cir.1987). The jury's award of $115,000.00 reflects its decision not to apply Dr. Rice's unrefuted and credible testimony. Finding no reasonable basis for this refusal, this court amends the judgment to award Mr. Goodwyne $553,055.00 in lost earnings, the lowest amount which could reasonably be awarded.

Fringe Benefits
Fringe benefits are an item of damages recoverable as a matter of law. Averna v. Industrial Fabrication & Marine Serv., Inc., 562 So.2d 1157 (La.App. 4 Cir.1990); see also Thibodeaux v. USAA Cas. Ins. Co., 93-2238 (La.App. 1 Cir. 11/10/94); 647 So.2d 351; Hawthorne v. Southeastern Fidelity Ins. Co., 387 So.2d 26 (La.App. 3 Cir.1980).
The testimonies of Dr. Rice and Mr. Goodwyne were unchallenged regarding loss of fringe benefits. Mr. Goodwyne testified that he would lose all hospitalization insurance benefits at the end of 1996 and his wife's benefits had already been terminated. Dr. Rice calculated that, at a cost of $445.42 per month, $65,648.00 needed to be set aside today to purchase that amount over the next 14.73 years. The refusal to award this amount was not reasonably supported in the record and was clearly wrong. We, therefore, amend the judgment to award this sum.

IV.

CONCLUSION
For the foregoing reasons, we reverse the jury's apportionment of fault and assign 100% fault to Clifford J. Morgan and his employer, People's Moss Gin, Inc. We amend the award for loss of past and future loss of earnings to $553,055.00 and award $65,648.00 in loss of fringe benefits.
All costs are assessed to the defendants-appellees, Clifford J. Morgan and People's Moss Gin, Inc.
REVERSED IN PART; AMENDED IN PART AND, AS AMENDED, AFFIRMED.