158 So.2d 875 (1963)
Ervin C. GLISSON et al., Plaintiff and Appellee,
v.
MISSOURI PACIFIC RAILROAD COMPANY et al., Defendant and Appellant.
No. 963.
Court of Appeal of Louisiana, Third Circuit.
December 3, 1963.
Rehearing Denied December 20, 1963.
Writ Granted January 20, 1964.
*876 Stewart & Bond, by John R. Stewart, Lake Charles, Hudson, Potts & Bernstein, by B. Roy Liuzza, Monroe, for defendant-appellant.
Marcantel & Cassidy, by Bernard N. Marcantel, Jennings, for plaintiff-appellee.
Before SAVOY, FRUGE and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit for damages for the wrongful death of Mrs. Martha Glisson, who was killed when the automobile, which she was driving, collided with a passenger train at a rural railroad crossing. The plaintiff, Mr. Ervin C. Glisson, surviving husband of the decedent, sues individually and on behalf of the minor children of Mrs. Glisson. Named as defendants are Missouri Pacific Railroad Company, owner of the passenger train, J. P. Kohler, Jr., operator of the train, and C. M. Todd, who held the position of fireman. A jury in the lower court held for the plaintiff. Defendants appealed. Plaintiff answered the appeal, seeking increases in the awards.
The accident occurred at about 12:30 p. m. on December 31, 1961 at a railroad crossing near Kinder, Louisiana. The weather was clear. Mrs. Glisson was driving in a westerly direction along a winding gravel road, through a wooded area, which extends up to the right of way for the railroad track. This right of way, running generally north and south, is 100 feet in width with a single main-line track down the center. The crossing itself is elevated about 2½ or 3 feet above the level of the gravel road, at a point 50 feet to the east of the crossing. A standard railroad stop sign is located at the east edge of the railroad right of way, on the north side of the gravel road and about 48 feet from the first track.
Since Mrs. Glisson and the other two passengers in her automobile were killed instantly, the only testimony in the record, as to the manner in which she drove upon the crossing, is that of the train crew, who stated that she did not stop at the stop sign, but continued to drive at a speed of from 20 to 25 miles per hour up onto the crossing, where her car was hit broadside by the passenger engine, which was approaching from the north at a speed of 64 miles per hour.
*877 It is the contention of the plaintiff that this case falls within the "dangerous trap" doctrine as set forth in Renz v. Texas & Pacific Railway Company, 138 So.2d 114 (3rd Cir.App. 1962); Simon v. Texas & New Orleans Railway Company, 124 So.2d 646 (3rd Cir.App. 1960) and McFarland v. Illinois Central Railroad Company, 122 So. 2d 845 (1st Cir.App. 1960). Succinctly stated, these cases, and the authorities cited therein, hold that if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings or providing signaling devices, etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good.
It is conceded that, because of the wooded area which extended up to the railroad right of way, Mrs. Glisson could not see the approaching train until she at least reached the stop sign, 48 feet from the tracks. The principal factual issue is whether the railroad had allowed weeds and bushes to grow in the right of way itself, so as to obstruct Mrs. Glisson's view of the approaching train, until she was only a few feet from the tracks. There is also some dispute as to whether, and for how long a period of time, the train blew its whistle or rang its bell before reaching the crossing. However, several of plaintiff's own witnesses testified they heard the whistle blow for a few seconds before they heard the crash. The train crew testified the whistle was blown continuously for a distance of 1800 feet before reaching the crossing. We conclude that the length of time the whistle was blown is uncertain, but certainly it was blown for a few seconds before the train reached the crossing.
Most of the evidence concerns itself with the question of whether the view of a westbound motorist to the north was obstructed by weeds and bushes growing within the railroad right of way. Plaintiff introduced the testimony of several witnesses who said this was a dangerous crossing and gave estimates, varying from 50 to 400 feet, of the distance which Mrs. Glisson, from a position at the stop sign, could see the approaching train. We do not think it necessary to discuss these estimates in detail because certain pictures, taken shortly after the accident, and the testimony of witnesses who actually measured the distance, show that the railroad right of way was clear of all view obstructing weeds and bushes for a distance of 380 feet north of the crossing. From a position at the stop sign, or at any point between the stop sign and the tracks, Mrs. Glisson had an unobstructed view 380 feet to the north. The railroad had kept its right of way cleared for this distance.
However, the railroad had not kept its right of way cleared beyond 380 feet. At that distance from the crossing, there were some small trees, 6 to 10 feet in heighth, growing near the tracks. These small trees partially obstructed Mrs. Glisson's view of the approaching train beyond 380 feet, i. e., she could have seen the top portion of the engine (the train was 15 feet high above the tracks) but she could not have seen the lower portion. The evidence shows she could see the top portion of the engine for a distance of at least 600 feet.
Under these facts we think it is clear that the dangerous trap doctrine has no application here. Mrs. Glisson did not have to place herself in a position of peril, dangerously close to the tracks, in order to see the approaching train. At any point between the stop sign (which was 48 feet from the tracks) and the crossing, Mrs. Glisson had an obstructed view of the approaching train for a distance of 380 feet, and a partially obstructed view for a distance of at least 600 feet.
*878 The three cases relied upon by plaintiff can be distinguished on the facts. In Renz v. Texas & Pacific Railway Company, supra, the motorist could not see the approaching train until his front wheels were "virtually on the tracks" because the railroad had parked two gondola cars on a switch track at the crossing. In Simon v. Texas & New Orleans Railway Company, supra, the approaching motorist's view of the approaching train was completely obstructed by weeds, 6 feet in heighth, growing in the railroad right of way in such a manner that the motorist could not see the train until his "* * * front wheels * * * were almost on the rails." In Mc-Farland v. Illinois Central Railroad Company, supra, the sharp angle at which the street crossed the tracks, trees and bushes growing in the right of way, a boxcar parked on a switch track, and certain buildings, prevented the motorist from seeing the approaching train until he was dangerously close to the tracks. Thus, in the three cited cases the motorist had to go dangerously close to the tracks to see the approaching train, whereas in the present case, Mrs. Glisson could see the approaching train from any point within 48 feet of the tracks.
We think it unnecessary to decide whether the railroad was guilty of negligence, in failing to clear its right of way for a greater distance than 380 feet from the crossing, or in failing to give adequate warning by blowing the whistle or ringing the bell for a longer period of time, because, in any event, the evidence is clear that Mrs. Glisson was guilty of contributory negligence barring plaintiff's recovery.
The general rule of law is that a motorist approaching a railroad crossing must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. Tucker v. Illinois Central Railroad Company, 141 La. 1096, 76 So. 212; Rachal v. Texas & Pacific Railway Company, La.App., 61 So.2d 525; Matthews v. New Orleans Terminal Company, La.App., 45 So.2d 547. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. Jackson v. Cook, 189 La. 860, 181 So. 195. If the motorist's view of the right of way is obstructed, he must exercise a higher degree of caution. See Renz v. Texas & Pacific Railway Company, 138 So.2d 114, and the authorities cited therein.
As regards the statutory requirement that a motorist must bring his vehicle to a complete stop at a railroad crossing (LSA-R.S. 32:243) this court has held in Simon v. Texas & New Orleans Railroad Company, supra, as follows:
"A motorist need not come to a complete stop before crossing a railroad provided the motorist has his automobile under such control as to be able to stop immediately and has exercised due care in looking and listening for an approaching train. See Robertson v. Missouri Pacific Railroad Co., La.App. 1936, 165 So. 527."
Applying these rules of law to the facts of the instant case, it is inescapable that if Mrs. Glisson had stopped at the stop sign, 48 feet from the crossing, she could and should have seen the train approaching. Even if she did not stop, but only slowed down and looked and listened for the approaching train, while maintaining her vehicle under such control as to be able to stop immediately, she could and should have seen the train approaching in time to stop. She lived in the immediate vicinity and was thoroughly familiar with this crossing and the view which she had of approaching trains. She certainly should have used greater caution.
Of course, the uncontradicted testimony of the train crew is that Mrs. Glisson did not stop, but proceeded onto the crossing at a speed of about 20 miles per hour. If she did this she is clearly contributorily negligent. However, even if the jury did not believe this testimony of the train crew, *879 the physical facts themselves show she was negligent. Had the decedent come to a stop upon entering the right of way, or had she even slowed down and looked and listened for an approaching train, as she was required to do, the accident would not have happened. Thus, her failure to use the care required of her was a cause of the accident and bars plaintiff's recovery.
For the reasons assigned, the judgment of the lower court is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the defendants, Missouri Railroad Company, et al., and against the plaintiffs, Ervin C. Glisson, et al., rejecting plaintiffs' demands at their costs. All costs of this appeal are assessed against the plaintiffs.
Reversed and rendered.
FRUGEé, Judge (dissenting).
The trier of fact concluded that there was a negligent defendant and no contributory negligence which would bar recovery. Unless the trier of fact was manifestly erroneous, its findings should not be overturned. I find no manifest error in its findings in the present case.
In order to hold the defendant negligent, the trier of fact had to find that the railroad crossing where the accident happened was obstructed and, if it was, then it had to further find that the railroad failed to give a proper warning prior to reaching the crossing. The evidence on both of these points is conflicting. However, the trier of fact was in a better position to evaluate this evidence and make findings. From a reading of the entire record, I can find no manifest error in its findings.
For the foregoing reasons, I respectfully dissent.

On Application for Rehearing.
En Banc. Rehearing denied.
TATE, J., dissents from denial of rehearing and assigns written reasons.
FRUGEé, J., dissents.
TATE, Judge (dissenting).
I respectfully dissent from the denial of the application for rehearing.
We have here a situation where there is much sworn testimony that the view of the grade crossing was so obstructed by underbrush and other growth that a motorist had to be almost on the track before he could see the train coming. The trial judge and jury accepted this testimony. Under this evidence, the defendant was maintaining a hazardous crossing, and the award should be affirmed.
Nevertheless, this appellate court, without seeing a single witness, disregards such substantial sworn testimony on the basis of certain photographs taken shortly after the accident. The majority overlooks that these photographs are in evidence only through the testimony of witnesses, who themselves may not be accurate as to the time the pictures were taken or whether these pictures actually reflected the scene according to the ordinary eye of a motorist, rather than being taken at a peculiar angle, etc.
In advertising, it is true, it is said that one picture is worth a thousand words. I do not believe that the same maxim should apply in a court of justice, so as to require that the complete discounting of the sworn testimony of apparently responsible witnesses to the effect that the scene in question was definitely not accurately depicted by the photographs as the scene existed to the ordinary eye of a motorist at the time of the accident, since high weeds and other growth actually obstructed the view of an oncoming motorist until he reached the top of the incline.
Further, I personally do not think the photographs, as studied in the peace and quiet of an appellate court library, necessarily reflect the scene as reasonably observable to the eye of a motorist, who should not be required necessarily to peer and study through the camouflaging growth *880 to ascertain whether a train is approaching without the warning required by law.
(I pass by the majority's finding that the train crew sounded the train horn, despite the substantial evidence accepted by the trial jury that it did not, except almost simultaneously with the collision. I have never read a record in a railroad case where the railroad employees did not testify that they had sounded the horn, while some of the lay witnesses testified to the contrary; in each instance, it was necessary for the trier of fact to conclude which set of witnesses was accurate in their recollection of the event. I see no more reason, on the face of the present record, to believe the railroad witnesses rather than the contrary witnesses, any more than in the other instances in the past where appellate courts refused to arbitrarily accept one set of the witnesses over the other, when the latter set was believed by the trier of fact. Incidentally, four witnesses testified for the plaintiffs to the lack of adequate signal at Tr. 187, 193, 200-201, 205-206.)
In the present case, for instance, substantial evidence is presented that the high weeds and other growth made this a blind crossing by several witnesses, including: Elmer Smith, a mail carrier, who crossed the intersection daily, Tr. 147; Boyd Lambert, a school bus driver, who likewise crossed the intersection regularly as part of his duties, Tr. 158-160; Maxwell Chaisson, who lived within 300 yards of the crossing, Tr. 168; Fred Rostrum, a nearby resident, Tr. 182-183; Bert Cottongin, another nearby resident, Tr. 119-121. Also, as I read the testimony of the investigating state troopers, it was not possible, due to high weeds and underbrush, for a motorist to see whether a train was coming if he stopped at the railroad stop sign 48 feet from the track, and instead it was necessary for the motorist to approach considerably closer. Tr. 69-70, 82-83.
Under all of these circumstances, I do not see how this appellate court is in a position to accept some of the defendants' photographs as necessarily more accurate than the sworn testimony of substantial witnesses for the plaintiff to the effect that such photographs do not accurately represent the scene at the time of the accident.
For these reasons, I respectfully dissent from a denial of the rehearing, since I feel that the majority's reversal is beyond the proper scope of appellate review.