647 So.2d 1140 (1994)
Bart P. RIVERE and Herman G. Rivere
v.
UNION PACIFIC RAILROAD COMPANY, Union Pacific Corporation, the Parish of Iberville, Louisiana, Charles Fontenot, and State of Louisiana, Through the Department of Transportation and Development.
No. 93 CA 1132.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Rehearing Denied January 9, 1995.
*1143 Walter L. Smith, Baton Rouge, for plaintiffs-appellees Bart P. Rivere and Herman G. Rivere.
Dorothy D. Thomas and Gayla Moncla, Baton Rouge, for defendant-appellant Missouri Pacific R. Co.
Stacey Moak, Baton Rouge, for defendant-appellant State of Louisiana, DOTD.
Daniel R. Atkinson, Baton Rouge, for defendant-appellant Parish of Iberville.
Before WATKINS, SHORTESS, CARTER, LeBLANC and FOGG, JJ.
WATKINS, Judge.
This case involves a collision between a pickup truck driven by plaintiff, Bart P. Rivere, and the engine of a train owned by Missouri Pacific Railroad Company (MOPAC). On appeal, defendants MOPAC and the State of Louisiana, through the Department of Transportation and Development (DOTD), raise issues concerning liability and quantum. We reverse in part and affirm in part.

FACTS
The record reflects the following facts. At approximately 9:00 a.m. on January 9, 1989, 22 year old Bart Rivere was driving a pickup truck owned by Herman G. Rivere at approximately 55 miles per hour on Louisiana Highway 1. The weather was cold and rainy. The windows of the truck were raised; the windshield wipers and radio were turned on. He slowed to approximately 20 miles per hour and turned right onto Laurel Ridge Road, a rural Iberville Parish road near White Castle, Louisiana. Bart Rivere passed an advanced railroad warning sign and a cross buck sign as he approached the MOPAC train tracks which run parallel to and approximately 130 feet from Louisiana Highway 1. He put the truck in neutral and coasted toward the elevated train tracks. At the crossing there were no flashing lights or gates, and no stop sign. Just before he reached the crossing, Bart Rivere looked to the left, saw a train approaching, and slammed on his brakes. Almost immediately, his truck collided with the lead engine of a northbound train owned by MOPAC.
*1144 As a result of the accident, Bart Rivere and Herman Rivere, plaintiffs,[1] sued MOPAC[2]; Charles Fontenot,[3] the train engineer; the Parish of Iberville; and DOTD. Plaintiffs settled with the Parish of Iberville and proceeded to trial against the remaining defendants.
After a bench trial, the court assessed the fault in causing the accident as follows: 50% to MOPAC for failure to blow the train's horn; 20% to MOPAC for failure to provide or maintain an adequate sight distance; and 30% to DOTD for failure to provide adequate sight distance or other protective measures. The court found Iberville Parish was free from fault. The trial court awarded damages in the sum of $504,806.71, which figure included $100,000.00 for past physical pain and suffering; $75,000.00 for future physical pain and suffering; $75,000.00 for past mental anguish; $25,000.00 for future mental anguish; $75,000.00 for loss of enjoyment of life; $50,000.00 for disability; $75,000.00 for lost future earning capacity; and $29,806.71 for medical expenses.
MOPAC and DOTD appeal that judgment. As to liability, MOPAC alleges the trial court erred in concluding that the train's horn was not sounded. MOPAC and DOTD argue that the trial court erred in its assessment of fault, including the findings that Iberville Parish and Bart Rivere were without fault. As to quantum, both DOTD and MOPAC allege the award was excessive.

LIABILITY OF RAILROAD
Initially, we will address two arguments advanced by MOPAC by which it seeks interdiction of the trial court's factual findings and a de novo review of the facts of this case by this court. First, MOPAC alleges the trial court committed prejudicial legal error by allowing witnesses Diana Vaughn and B.F. Dowers to be examined using statements to "refresh recollection" and then refusing to allow defendant's counsel to inspect the statements. Ms. Vaughn was one of several witnesses who was not on the train, but in the vicinity at the time of the accident, and testified that no train whistle was blown immediately before or at the time of the crash. Mr. Dowers was a crew member on the train at the time of the accident; he testified, as did other crew members, that the horn was blown. In response to this argument, plaintiffs contend that the use of the statements was entirely proper and that use of the statements did not occur during any critical parts of either witness's testimony. Considering the minimal use of the statements to refresh the memories of these witnesses and the cumulative nature of the testimony involved, we find that, if the trial court did err, such error would not have a prejudicial effect requiring the interdiction of the trial court's factual findings. Therefore, if any error did occur, it was harmless. MOPAC further asserts that the trial court was confused by the plaintiffs' presentation of evidence and testimony concerning tapes that possibly existed in the train to record conversation and speed, and that such is sufficient to interdict the trial court's factual findings. Initially, our review of the record does not convince us that any such confusion exists. Additionally, review of the trial court's appreciation of the facts of the case is a question of manifest error in its factual determinations, not of whether the factual findings should be interdicted. Interdiction occurs only when the trial court has made one or more legal errors which have a prejudicial effect on the case. Moore v. Clark, 517 So.2d 293 (La.App. 1st Cir.1987). See McLean v. Hunter, 495 So.2d 1298 (La.1986); Picou v. Ferrara, 483 So.2d 915 (La.1986).
The trial court found that this accident occurred because Bart Rivere did not *1145 have an audible warning that a train was approaching (no horn was blown) and because Bart Rivere was unable to see the train approaching in sufficient time to avoid the accident. On that basis, it assessed the railroad with 70% of the fault in causing the accident, 50% for failure to provide a sound warning and 20% for failure to maintain an adequate sight distance.
MOPAC contends the trial court manifestly erred in finding that it failed to blow the train's horn. In reaching its conclusion, the trial court relied on the testimony of the four persons who were not on the train and who testified that they heard no horn. MOPAC argues that the positive testimony of the railroad employees that the horn was blown is entitled to more weight than the negative testimony that the horn was not blown, citing Lagrange v. Missouri Pacific Railroad Company, 503 So.2d 1158 (La.App. 3rd Cir.1987). We find the Lagrange case is not dispositive of this issue. That case held that negative testimony that a person did not hear a warning signal will not prevail over positive and credible testimony that such a warning signal was displayed; positive testimony of the crew members can, however, be disregarded if the members of the train crew are not worthy of belief. In the instant case, the trial court found that "[t]he testimony of the four persons who were not on the train all support [the conclusion that Bart Rivere did not have an audible warning that the train was approaching].... This evidence was more credible to this factfinder than the testimony of some of the crew members." We find no manifest error in the trial court's conclusion that the testimony of the MOPAC crew members regarding the horn was not credible.
Herein, the trial court was faced with two versions of the facts. Some witnesses testified that the horn was blown; others testified that it was not blown. When conflicting evidence creates two possible views of the evidence and the factfinder's choice between the two views is reasonable in light of the entire record, the factfinder's choice between the two views can virtually never be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). Therefore, we can find no manifest error in the trial court's determination that the train's horn was not blown.
MOPAC further argues that the trial court erred in assessing it with 20% fault because of the inadequate sight distance. MOPAC contends that because the obstructions were not within its right-of-way it is not responsible for the inadequate sight distance.
According to Louisiana law MOPAC has the duty to erect and maintain a "Railroad Cross Buck" sign at the crossing. LSA-R.S. 32:169.[4] The railroad also has the duty to maintain its right-of-way adjacent to the railroad tracks. It is uncontroverted that the cross buck sign was in place at the Laurel Ridge Road crossing at the time of this accident and that the railroad's 50 foot right-of-way was clear.
Any other duties of the railroad with regard to further safety devices rises in proportion to the increasing dangerousness of the crossing, as determined by an approaching vehicle's ability to see the oncoming train. This concept is referred to as the "dangerous trap" doctrine. A crossing is considered a "dangerous trap" when it is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train. When a dangerous trap exists, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning or providing signaling devices, etc. Glisson v. Missouri Pacific Railroad Company, 158 So.2d 875 (La.App. 3rd Cir.1963). As discussed more fully below, the Laurel Ridge Road crossing was not a "dangerous trap" because Bart Rivere did not have to place himself in a position of peril to view the tracks and because he was familiar with the crossing. Accordingly, we believe that the trial court *1146 erred in assessing any percentage of fault to MOPAC for the inadequate sight distance.

LIABILITY OF PLAINTIFF
MOPAC and DOTD argue strenuously that some degree of fault should have been assessed to Bart Rivere for his failure to exercise a greater degree of diligence. The allocation of fault is a factual finding subject to the manifest error standard of review. Watson v. State Farm and Casualty Insurance Company, 469 So.2d 967 (La. 1985); Epps v. City of Baton Rouge, 604 So.2d 1336 (La.App. 1st Cir.1992). For an appellate court to reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La. 1987). Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993); Rosell v. ESCO, 549 So.2d 840 (La.1989).
Because the trial court failed to mention any duties imposed on the plaintiff in this case we assume that the court's finding of no fault on the part of the plaintiff was based upon the opinion of the plaintiff's expert that the crossing did not have adequate sight stopping distance according to guidelines recommended by the American Association of State Highway Transportation Officials (ASHTO).[5] We believe that this decision was clear error.
"The general rule of law is that a motorist approaching a railroad crossing must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. If the motorist's view of the right of way is obstructed, he must exercise a higher degree of caution."
Glisson v. Missouri Pacific Railroad Company, 246 La. 470, 165 So.2d 289, 291 (1964), quoting Glisson v. Missouri Pacific Railroad Company, 158 So.2d 875 (La.App. 3rd Cir.1963). (Citations omitted.)
This general rule of law is tempered by the "dangerous trap" doctrine which exonerates a driver if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train. In these circumstances the railroad will be held liable unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warning devices. Glisson, supra; Burk v. Illinois Cent. Gulf Railroad Company., 529 So.2d 515 (La.App. 1st Cir.), writ denied, 532 So.2d 179 (La.1988).
The testimony herein reveals that Bart Rivere had an unobstructed view of the railroad track from 50 feet from the east rail of the track. He admitted that he knew he was coming to a railroad crossing where a train might be present but that he did not look because he knew he could not see anything if he had looked. His testimony continued as follows:
Q. Were you concerned after you made the turn? You knew there was a track right ahead of you, right?
A. Yes.
Q. Were you concerned if a train was coming that you might not be able to stop going at the speed you were going?
A. No.
Q. You weren't concerned about that?
A. It never entered my head, no. *1147 He further stated that he did not look for a train until he was approximately two seconds from impact.
Although the law does not require that a driver stop at every railroad crossing,[6] it is clear from the jurisprudence that a driver cannot expect to drive with impunity through a railroad crossing where his view is obstructed.[7] See Lee v. Missouri Pacific Railroad Company, 540 So.2d 287 (La.1989); Dixon v. Mid-South Rail Corporation, 580 So.2d 438 (La.App. 2d Cir.), writ denied, 584 So.2d 1160 (La.1991); Burk, 529 So.2d 515; Hebert v. Missouri Pacific Railroad Company, 366 So.2d 608 (La.App. 3d Cir.1978), writs denied, 369 So.2d 153, 155 (La.1979); Lagrange v. Missouri Pacific Railroad, 503 So.2d 1158 (La.App. 3d Cir. 1987); Richard v. Missouri Pacific Railroad Company, 536 So.2d 755 (La.App. 3d Cir. 1988). We believe that this rule is applicable notwithstanding the inability of the driver to hear the train horn, whether such failure is because of the negligence of the train engineer or because of other factors such as inclement weather, windshield wipers, car radio, heaters or air conditioners. See Dixon, 580 So.2d 438, and Hebert, 366 So.2d 608. (See also Lee, 540 So.2d 287, wherein the court explains the limited value of horns and whistles as advance warning devices).
The evidence clearly establishes that Bart Rivere had a clear view of the tracks at a point which would not place him in a perilous position. Furthermore, he was familiar with the prevailing conditions at the crossing.[8] Under these facts we believe that Bart Rivere breached his duty to see what he should have seen, which breach was a legal cause of his injuries.

LIABILITY OF PARISH
The appellants also argue that the trial court erred in finding no fault on the part of the Parish. We agree. The trial court made the following findings with respect to the liability of the Parish:
The defendants have not borne their burden of persuading the Court that the Parish was negligent in any [way] that was a cause of the accident.... The experts agreed the signing was adequate, except for the possible need for a sign along state Highway 1 alerting turning motorists that a railroad crossing would be encountered an unusually short distance after turning. But such a sign was the responsibility of the State if it was needed, since it would have been on the state highway. The Parish made a request for automatic warning at this crossing to the State, but the State *1148 never inspected or studied the crossing for safety.
It is well settled that a governing authority which has jurisdiction over a particular roadway has a legal duty to make that roadway reasonably safe for travel. Chaney v. National Railroad Passenger Corporation, 583 So.2d 926 (La.App. 1st Cir.1991). This includes the duty to erect warning signs to warn motorists of unusually dangerous conditions such as dangerous railroad crossings. Id. See also LSA-R.S. 32:42[9]
The uncontroverted evidence establishes that Laurel Ridge Road is a parish road maintained and supervised by the parish. Carl Grant, the secretary-treasurer and parish engineer for the Iberville Parish Police Jury, testified that Laurel Ridge Road is a parish road which received an asphalt overlay in 1969. The parish also placed a railroad sign on the road. He stated that the parish is responsible for maintaining approximately 25 feet from the centerline of Laurel Ridge Road on both sides, and that it maintains the 25 feet from the centerline regardless of whether the area crosses over the servitudes of the State or the railroad.
In 1972, the Iberville Police Jury requested that the State study all 13 railroad crossings in Iberville Parish to determine the necessity of automatic signaling devices. Mr. W.T. Taylor, Jr. director with the DOTD, responded by letter dated March 3, 1972, stating that the DOTD did not have the available personnel to study all such crossings. He suggested that the Parish submit a list of the major highway railroad crossings that it wished studied and the DOTD would attempt to have them scheduled. He further stated that "[w]e do not have personnel to study the parish railroad crossings."
The Parish contracted with Bernard & Thomas Engineering Company to have the parish railroad crossings evaluated and prioritized in 1979. Laurel Ridge Road was ranked 13th out of 13 crossings with no prior accident history. According to Mr. Grant, the Parish decides the crossings for which it will seek federal funds to improve.
It is clear that Laurel Ridge Road is a parish road maintained by the Parish and that any responsibility the State may have with regard to the crossing did not absolve the Parish of its responsibility for the safety of the railroad crossing. This is evidenced by the Parish's maintenance of Laurel Ridge Road, its communications with the State, and through its continual efforts to obtain federal funds for railroad crossings throughout the parish.
Although the sight obstructions which hindered the plaintiff's view of the train were not located within the parish right-of-way, this fact does not relieve the Parish of its responsibility for this railroad crossing. See Highlands Insurance Co. v. Missouri Pacific Railroad Company, 532 So.2d 317 (La.App. 3rd Cir.1988), aff'd sub non., Lee v. Missouri Pacific Railroad Company, 540 So.2d 287 (La.1989). The Parish's responsibility extends beyond passive acceptance of a dangerous situation and requires affirmative action such as erecting additional warning signs, erecting a stop sign, clearing the sight obstructions, or closing the crossing.[10] By failing to ameliorate the hazardous condition the Parish breached its duty to Bart Rivere. We are further convinced that this breach was a legal cause of the plaintiff's injuries.

LIABILITY OF DOTD
The most troubling issue presented in this case is the liability of the DOTD. Because Laurel Ridge Road is a parish road state law does not impose an independent duty upon the DOTD to maintain the roadway or monitor the railroad crossing for *1149 sight distance obstructions. However, in similar cases courts have imposed a duty on the DOTD through the provisions of the federal Highway Safety Act which was enacted in 1973. The Act makes federal funds available to the states to improve grade crossings, in return for which the state must "conduct and systematically maintain a survey of all highways to identify those railroad crossings which may require separation, relocation, or protective devices, and establish and implement a schedule for this purpose. At a minimum, such a schedule shall provide signs for all railway-highway crossings." U.S.C.A. 23 § 130(d).
The trial court found the DOTD thirty percent at fault in this accident based upon "its failure to fulfill its duties under the federal railroad crossing improvement program."
In the instant case the State's involvement with the Laurel Ridge Road crossing consisted of its response to the Parish's blanket request for signalization of all parish crossings, which response indicated that the State did not have the personnel to evaluate each crossing but that it would attempt to assist the Parish with crossings the Parish considered dangerous. Over the ensuing years the Parish and the DOTD worked together on the improvement of five crossings in Iberville Parish. The only other affirmative state action with regard to the Laurel Ridge Road crossing was the placement of an advance warning sign. The sign was placed on Laurel Ridge Road as part of the minimum requirements of the federal program wherein signs were installed by the State on all grade crossings.[11] The State specifically informed the Parish of these installations and requested that the Parish maintain the signs. The sign placed at the Laurel Ridge Road crossing was a replacement of an existing sign installed by the Parish.
The question then becomes whether the plaintiff proved that the State breached the duty imposed under the federal Highway Act; that the duty was imposed to guard against the particular risk involved; and that it was a legal cause of this accident.
Initially we recognize that the breach of a federal statute which may result in the cut-off of federal funds, does not, in and of itself, create a private right of action for its breach. Daye v. Commonwealth of Pennsylvania, 344 F.Supp. 1337 (E.D.Penn. 1972), affirmed, 483 F.2d. 294 (3d Cir.1973), cert. denied, 416 U.S. 946, 94 S.Ct. 1956, 40 L.Ed.2d 298 (1974). See also Arnold v. Illinois Cent. Gulf Railroad, 501 So.2d 778 (La. App. 1st Cir.1986), writ denied, 503 So.2d 479 (La.1987).
Although the plaintiffs contend that the DOTD's failure to survey the crossing was a breach of its duty under the Highway Act it does not appear from the record in this case that the State was ever denied federal funds under the railroad improvement program. As best as can be determined from the record before us, it appears that in maintaining its schedule of prioritized crossings the DOTD relies in some instances upon the information it receives from the local governing authorities responsible for the crossings. We are not cited to any authority which would indicate that this method of surveying the over 4000 crossings in this state is improper or a breach of the DOTD's duty. To the contrary, human experience would dictate that the governing entity directly affected by and ultimately responsible for the crossing could be the best source of information. Indeed, the facts in the instant case reveal that the federal funds are allocated through the State to parish crossings upon request of the parish and it is the parish that determines which crossings it wants improved.[12] The evidence shows that the State and the Parish had a close working relationship with regard to the improvement of crossings in Iberville Parish and that the Parish was actively involved with improving railroad crossings. However, the record indicates that when the Parish sought signalization *1150 for all its crossings, it did not include any supporting data which would have indicated to the DOTD that Laurel Ridge Road was a dangerous crossing. Moreover, the survey later conducted by the Parish indicated that the Laurel Ridge Road crossing was the least dangerous of the Parish crossings.
Under these circumstances we do not believe that the DOTD breached a duty with regard to the Laurel Ridge Road crossing nor do we believe that DOTD assumed a duty as was the case in Rick v. State, DOTD, 93-1776, No. 93-1784 (1/14/94); 630 So.2d 1271, and Arnold v. Illinois Cent. Gulf Railroad, 501 So.2d 778 (La.App. 1st Cir.1986), writ denied, 503 So.2d 479 (La.1987), where the State had knowledge of the hazardous nature of the crossing through its own inspections and records. Furthermore, we do not believe that the indiscriminate placement of advance warning signs on all railroad crossings throughout the state constitutes the assumption of a duty by the DOTD as to every crossing.
Plaintiffs failed to prove that an alleged breach of the federal statute was a legal cause of this accident. Furthermore, the evidence does not support the conclusion that a survey of this crossing by the DOTD would have placed the crossing on a prioritized status that would have prompted the improvement of the crossing.

REAPPORTIONMENT OF FAULT
Having reversed the trial court's findings of fault on the part of DOTD and MOPAC for inadequate sight distance and its findings of no fault on the part of the Parish and Bart Rivere, we must reapportion fault. Since the complete record is before this court, we will, in the interest of judicial economy, make this determination, rather than remanding this case to the trial court. Gonzales v. Xerox Corporation, 320 So.2d 163, 165-66 (La.1975). The erroneous finding of liability on the part of DOTD has interdicted the trial court's factual findings on the percentage of fault for the other parties. Consequently we must make an independent review of the evidence when we reapportion the fault between the remaining tort-feasors. Suhor v. Gusse, 388 So.2d 755 (La.1980). In assigning percentages of fault attributable to each tort-feasor, a court should consider both the nature of each party's conduct and the extent of the relation between that conduct and the damages suffered. Watson v. State Farm Fire and Casualty Insurance Company, 469 So.2d 967, 974 (La.1985). In Watson, the Louisiana Supreme Court indicated which factors should be considered in order to apportion fault:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
469 So.2d at 974, quoting Uniform Comparative Fault Act, s(b), and Comment (as revised in 1979).
After weighing these factors against the conduct of the respective parties we apportion 25% of the fault to the plaintiff, 25% to Iberville Parish and 50% to MOPAC.

QUANTUM
Both MOPAC and DOTD argue that the trial court abused its discretion in making an excessive award of damages to the plaintiffs. The trial court made the following findings in his award of damages:
[T]he Court finds according to the detailed, accurate account of the medical evidence in plaintiff's post trial memo on pages 41-48. The Court also was impressed with the evaluation, opinions, and credentials of vocational evaluator Bobby Roberts, and accepts his testimony. This includes his strength and endurance testing of the left hand and arm and the right elbow.

*1151 Before the accident, Mr. Rivere had the physical and mental capacity to be a plant operator, even if he had not exercised that capacity in his 22 years. He is no longer physically capable of that prime line of work for a non-college educated person in the River parishes, and will not be in the future. This is also true of plumbing work, electrical, welding, carpentry, etc. Further formal education was not recommended by either plaintiff or defense expert. These lost capabilities pay in the range of $10 to $14 per hour, and he is now left with possibilities in the $5.00 to $7.50 range. According to Louisiana damage law, this loss of earning capacity, apart from actually demonstrated lost wages is compensable.
Mr. Rivere underwent 7 operative procedures under general anaesthetic. He was completely unable to use either arm or hand for almost 3 months, and was unable to feed, bathe, or clean himself during this time, reducing him to a humiliating dependence. He has been left with permanent partial disabilities that have affected his lifestyle significantly. His schooling was interrupted. He has been unable to find a job after many months.
The Louisiana Supreme Court in its most recent consideration of the issue, stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corporation, 623 So.2d 1257 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). After thoroughly reviewing the record, we do not find that the trial court abused its discretion in the award of damages.

CONCLUSION
For the foregoing reasons, we reverse the trial court judgment finding the DOTD at fault and Bart Rivere and Iberville Parish free from fault. We further reverse that portion of the trial court judgment finding Missouri Pacific Railroad Company 20% at fault for inadequate sight distance. We render judgment assessing 25% fault to the plaintiff, Bart Rivere; 25% to Iberville Parish; and 50% to Missouri Pacific Railroad Company. The judgment is affirmed in all other respects. Costs of this appeal are assessed 50% to Missouri Pacific Railroad Company and 50% to Bart Rivere.
REVERSED IN PART; AMENDED IN PART; AS AMENDED, AFFIRMED IN PART.
FOGG, J., concurs in part and dissents in part for reasons assigned.
CARTER, J., concurs in part and dissents in part for reasons assigned by FOGG, J., and assigns additional reasons.
FOGG, Judge, concurring in part and dissenting in part.
I agree with that portion of the majority opinion which affirms the judgment of the trial court and disagree with that portion of the majority opinion which reverses the judgment of the trial court. I believe that there is no manifest error in the trial court's allocation of fault.
The trial court found that Bart Rivere's ability to see the approaching train was severely impaired because the sight distance to the left was
... totally inadequate under the circumstances of this case. The speed of the train was far too fast for the available sliver of space not obstructed by growth to be of any benefit to a motorist proceeding in a reasonable manner.... As soon as Mr. Rivere turned onto Laurel Ridge Road, he was already within the minimum sight stopping distance. A turning to the left at the beginning of his approach would have made him looking only at trees and bushes, and not at any train, and not at the road and crossing ahead of him. Also, he would not have seen the train at any critical moment because at such moments the train was not yet within the visible gap before the trees.... The math of the speed of the train and the truck in feet per second, with them meeting at the same spot at the same time, and with the distances accurately determined from the photos as related to the telephone post distances demonstrates that Mr. Rivere *1152 could not have seen the train approaching from his left no matter what he did until he was considerably less than 75 feet from the tracks.... [W]hen Mr. Rivere was 79 feet from the crossing, which was less than the distance he needed to perceive and react to a train and stop, he had a view down the tracks of only 247 feet, while the train was still 324 feet away.
These factual conclusions are supported by the record. The tracks were 132 feet from and parallel to Louisiana Highway 1. Bart Rivere made a 45 degree, right turn onto Laurel Ridge Road. Because of the close proximity of the highway and the tracks, he was, at that point, only five to seven seconds from the track. The land to his left, between the railroad track and Highway 1, was covered with trees and bushes which prevented him from seeing the train no matter what he did until he was considerably closer to the tracks. Civil engineer Michael Aderman testified that when Bart Rivere was 79 feet from the crossing, he had a view down the track of only 247 feet, while the train was still 329 feet away. Therefore, at 79 feet from the crossing, Bart Rivere still could not see the train. This conclusion was confirmed by other expert testimony concerning the available sight distance. In fact, Bart Rivere could not see the train until he was approximately 75 feet from the tracks. At that point, he was at most four seconds from the crash. The trial court relied heavily on the testimony of Michael Aderman and found that this distance was less than needed to perceive and react to a train, and to stop. After closely considering the facts of this case, it is clear that the trial court did not manifestly erred in its determination that the sight distance was inadequate.
The trial court determined that the inadequate sight distance was due to the trees and bushes which covered most of the property between Louisiana 1 and the tracks. That tract of land was occupied entirely by DOTD's right-of-way and the railroad's right-of-way. The court stated, "The sight distance problem was in large part caused by the simple failure of the State to keep the area within its right of way along Highway 1 mowed properly so that the bushes and willows which had been allowed to grow up would have been kept down." There is no manifest error in this conclusion. The record further supports the conclusion that MOPAC should bear some degree of fault for the inadequate sight distance. MOPAC was aware of the sight distance obstruction and did not clear it or give notice to DOTD to clear the brush and growth from the right-of-way.
The trial court determined that Bart Rivere was proceeding in a reasonable manner by traveling less than 20 miles per hour as he approached the tracks and, even if he had looked to the left at the first moment at which the train was visible, he could not have avoided the accident; therefore, his actions were not a cause of the accident. This conclusion is supported by the evidence accepted by the trial court concerning the available sight distance. In the trial court's determination that the actions of Bart Rivere were not a cause of the accident, there is no manifest error.
The majority found that the trial court erred in assessing no fault to Ascension Parish. I disagree. The evidence in the record with regard to the Parish is very limited. The experts agreed the signing at the crossing was adequate. The Parish requested that the State place automatic warning equipment at this crossing, however, the State never inspected or studied the crossing for safety. Considering the limited evidence, there is no manifest error in the trial court's finding that the evidence is insufficient to conclude that the action or inaction of the Parish was a cause of the accident.
Finally, the majority found that the trial court erred in its assessment of fault to DOTD. With respect to DOTD's duty to provide protective measures, the trial court stated, "The evidence also shows that the State did not properly fulfill its duties under the federal railroad crossing improvement program...." The record reflects that the State gets $3.5 million per year from the federal government to upgrade railroad crossings, including crossings on parish roads, and that, in response to the Parish of Iberville's request that automatic gates be installed at all railroad crossings in the parish, *1153 DOTD stated that it would evaluate each crossing before implementing any type of improvement. This constitutes the assumption by DOTD of the responsibility to upgrade crossings where necessary. See Rick v. State, Department of Transportation and Development, 93-1776, 93-1784 (La. 1/14/94); 630 So.2d 1271. Therefore, the trial court was not manifestly erroneous in determining that DOTD had ample time in which to install the protective devices and upgrade the crossing and its failure to do so constituted a breach of duty owed.
For the foregoing reasons, I respectfully concur in part and dissent in part.
CARTER, Judge, concurring in part and dissenting in part.
I am in agreement with that portion of the majority opinion which affirms the judgment of the trial court. However, for the reasons assigned by Fogg, J. and additional reasons that follow, I disagree with that portion of the majority opinion which reverses the trial court.
I respectfully submit that the majority opinion fails to properly observe the standard of review required by Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993); Lirette v. State Farm Insurance Company, 563 So.2d 850 (La.1990); Rosell v. ESCO, 549 So.2d 840 (La.1989); Mart v. Hill, 505 So.2d 1120 (La. 1987); and Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Under the principles espoused by these cases, before an appellate court may reverse a trial court's factual finding, it must find from the record that a reasonable factual basis does not exist for the finding of the trial court and that the record establishes that the finding is clearly wrong. See Mart v. Hill, 505 So.2d at 1127. Thus, the reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882; Rosell v. ESCO, 549 So.2d at 844.
The issue to be resolved is not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony as well, unless the stated reasons of the expert are patently unsound. Lirette v. State Farm Insurance Company, 563 So.2d at 853.
Moreover, where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883. However, where the documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, an appellate court may find manifest error or clear wrongness even in a credibility determination. Rosell v. ESCO, 549 So.2d at 844-45.
In the instant case, the trier of fact determined that the actions of the DOTD and MOPAC were the cause of the unfortunate event. Upon review, our function is not to determine whether the trier of fact was right or wrong. See Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Even though we may feel that our own evaluations and inferences are more reasonable than the fact finder's, we cannot disturb reasonable evaluations of credibility and reasonable inferences of fact where conflict exists in the testimony. Stobart v. State, Department of Transportation and Development, 617 So.2d at 882. Moreover, where two permissible views of the evidence exist, the fact finder's choice between them cannot *1154 be clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d at 883.
For this court to continue to correctly identify the manifest errorclearly wrong standard as the standard to apply to appellate review of facts and then err in the application of the standard, as the majority does in the case sub judice, only invites continuing reversals by our supreme court.
Correctly applying the standard of review requires an affirmation of the trial court in all respects. I, therefore, concur in part and dissent in part for the reasons assigned by FOGG, J. and for the above and foregoing reasons.
NOTES
[1] Herman Rivere joined in the suit seeking property damage. His property damage claim was not mentioned in the reasons for judgment, but the judgment is in favor of both Herman and Bart Rivere.
[2] Plaintiffs initially named Union Pacific Railroad Company and Union Pacific Corporation as defendants. MOPAC answered the lawsuit claiming that plaintiffs had erroneously named Union Pacific Railroad Company and Union Pacific Corporation as defendants. Subsequently, plaintiffs dismissed Union Pacific Railroad Company and Union Pacific Company from the suit.
[3] The record does not indicate that Fontenot was ever dismissed from the lawsuit, but he is not cast in the judgment.
[4] LSA-R.S. 32:169 also permits the railroad to place a stop sign at crossings with the written approval of the DOTD.
[5] It is important to note that the guidelines established by ASHTO are the optimum requirements for new highway design and reconstruction of existing highways. Furthermore, the guidelines are based upon roadway intersections of ninety degrees and a sixty-five foot vehicle.
[6] A motorist's responsibility when driving over a railroad crossing is defined in LSA-R.S. 32:171. Under this statute a motorist is required to stop within fifty feet but not less than fifteen feet from the nearest rail when:

(1) A clearly visible electric or mechanical signal device gives warning of the immediate approach of a railroad train.
(2) A crossing gate is lowered or when a human flagman gives or continues to give a signal of the approach or passage of a railroad train.
(3) A railroad train approaching within approximately nine hundred feet of the highway crossing emits a signal in accordance with R.S. 32:168, and such railroad train, by reason of its speed or nearness to such crossing, is an immediate hazard.
(4) An approaching railroad train is plainly visible and is in hazardous proximity to such crossing.
[7] This rule of law has now been legislatively codified in LSA-R.S. 32:175 which provides that:

A. The driver or operator of a vehicle approaching a rail-highway grade crossing identified by the presence of a railroad cross buck sign shall slow down to a speed reasonable for the existing conditions, or shall stop if necessary, before entering the cross walk on the near side of the intersection or, in the event there is no cross walk, at a clearly marked stop line, or if none, then at the point nearest the intersecting rail of such railroad where the driver or operator has a clear view of any approaching train. The driver or operator shall listen and look in both directions along such track for any approaching train and for signals indicating the approach of a train. Having slowed or stopped in this manner, the driver or operator shall yield the right of way to any approaching train and then shall proceed only upon exercising due care and upon being sure that it is safe to proceed.
[8] In Lagrange, 503 So.2d 1158, and Kavanaugh v. Travelers Insurance Company, 203 So.2d 780 (La. App. 2d Cir.1967), the courts considered the motorist's familiarity with the prevailing conditions of the railroad crossing in concluding that the "dangerous trap" doctrine was inapplicable.
[9] Under the Highway Regulatory Act, LSA-R.S. 32:42, local parish authorities have, with respect to highways other than state maintained highways within their territorial limits, the power to adopt ordinances consistent with the Highway Regulatory Act. There is specific authority to erect stop signs at particularly dangerous railroad crossings. See also LSA-R.S. 32:235 B.
[10] The evidence established that this particular road was in existence in 1939 when Louisiana Highway 1 was constructed. Laurel Ridge Road was primarily a farm to market road and today only services three residences. It was also revealed that there is another railroad crossing within 2000 feet of the Laurel Ridge Road crossing which is accessible by the residents on Laurel Ridge Road.
[11] Federal funds were used to purchase and install the advance warning signs.
[12] Once the request is made the State conducts its own survey of the crossing. If it is approved for improvement by the State, then the State seeks approval from the Federal Railroad Safety Administration.