366 So.2d 608 (1978)
Mrs. Wanda Kidder HEBERT, Individually, et al.
v.
MISSOURI PACIFIC RAILROAD COMPANY et al.
No. 6720.
Court of Appeal of Louisiana, Third Circuit.
December 20, 1978.
Rehearings Denied January 31, 1979.
Writs Refused March 23, 1979.
*609 Dubuisson, Brinkhaus & Dauzat, James G. Dubuisson, Opelousas, for defendant-appellant, Missouri Pac.
William J. Doran, Jr., Baton Rouge, for defendant-appellant, Highways.
Morrow & Morrow, Patrick C. Morrow, Opelousas, for plaintiffs-appellees, Mrs. Hebert.
Dean Lomenick, & Seemann, G. Frederick Seemann, Opelousas, for plaintiff-appellee.
John A. Jeansonne, Jr., Lafayette, for defendant-appellees.
Boagni & Genovese, James T. Genovese, Opelousas, for plaintiff-appellant-appellee.
Domengeaux & Wright, William P. Rutledge, Lafayette, for plaintiff-appellee.
Before CULPEPPER, FORET and CUTRER, JJ.
CUTRER, Judge.
This is a companion case to the cases of Guidry, Sr., et al. v. Missouri Pacific Railroad Company et al., 366 So.2d 617; Stelly, Ind., et al. v. Missouri Pacific Railroad Company et al., 366 So.2d 617; Guidry v. Missouri Pacific Railroad Company et al., 366 So.2d 618; and Lalonde et al. v. Missouri Pacific Railroad Company et al., 366 So.2d 619. We render separate decisions in each case this date.
These five suits arise out of an accident occurring when a pickup truck and a freight train collided at a railroad crossing on the edge of the Town of Arnaudville, Louisiana.
On December 6, 1974 at approximately 3:00 P.M., Phillip Guidry was operating a pickup truck, owned by his father, Charles A. Guidry, Sr., along Louisiana Highway 686. As the pickup crossed an intersection *610 of the highway and the Missouri Pacific Railroad, it was struck by Missouri Pacific's freight train. The defendant's railroad runs in a north-south direction along the east edge of the Town of Arnaudville. Louisiana Highway 686 runs east-west. The train was traveling north and the pickup was traveling west. The train hit the truck on the driver's side. The pickup was occupied by three passengers, Wilfred Charles Hebert, Voorhies Lee Stelly, Jr., and Keith Guidry. Voorhies Stelly, Jr., was killed and the remainder of the occupants of the pickup received injuries of varying degrees. At the time of the accident it was raining.
The crossing is approximately level with only a slight rise as the highway goes over the railway. There were no automatic signal devices to warn the public of an approaching train. The crossing had standard "cross-buck" signs in the right of way and Highway Department warning signs some distance from the crossing. There was no "Louisiana Law Stop" sign at the crossing.
Mrs. Wanda Kidder Hebert, a widow, brought suit individually and on behalf of her minor son, Wilfred Hebert, for damages against Missouri Pacific Railroad Company, Department of Highways of the State of Louisiana, and Charles A. Guidry, Sr., and his liability insurer Hartford Accident & Indemnity Company. Wilfred Hebert became a major during the proceedings and he was made a party plaintiff along with Wanda Hebert. Keith Guidry brought suit for damages against Missouri Pacific Railroad Company, Department of Highways of the State of Louisiana, and Charles A. Guidry, Sr., and his insurer Hartford. Voorhies Lee Stelly and Mrs. Clara Mae Lalonde, divorced parents of Voorhies Lee Stelly, Jr., brought suit for the death of their son against Missouri Pacific Railroad Company, Department of Highways of the State of Louisiana, and Charles A. Guidry, Sr., and his insurer Hartford. Charles A. Guidry, Sr., brought suit individually and on behalf of his minor son, Phillip, against Missouri Pacific Railroad Company and Department of Highways, State of Louisiana.
The trial court rendered judgment in favor of all plaintiffs against all defendants except in the case of Guidry, Sr., et al. v. Missouri Pacific Railroad Company et al., 366 So.2d 617; this suit was dismissed, the court finding that Phillip Guidry, driver of the pickup, was contributorily negligent. Motions for a new trial were filed and denied. Appeals were taken and subsequently the trial court, having lost jurisdiction, improperly rendered an amended judgment dismissing the judgments against Charles A. Guidry, Sr. and his insurer Hartford on the ground that Guidry was the employer of the passengers in the truck; thus no recovery could be had in tort against Guidry but plaintiffs were limited to workmen's compensation claims. This court ordered the suits remanded for the purpose of allowing the trial court an opportunity to correct the error and render new judgments. This was done and appeals were again duly taken by the Department of Highways of the State of Louisiana (hereinafter referred to as Highway Department), Missouri Pacific Railroad Company (hereinafter referred to as Missouri Pacific), and Merle Browning in each suit. Charles A. Guidry, Sr., also appeals the dismissal of the suit in which he was plaintiff. Wanda Hebert and Wilfred Hebert answered the appeals in this case seeking an increase in damages.
The issues presented by these appeals are as follows:
(1) Whether Missouri Pacific and its engineer, Merle Browning, were negligent and, if so, whether such negligence was a proximate cause of the accident;
(2) Whether the Highway Department was negligent and, if so, whether such negligence was a proximate cause of the accident;
(3) Whether the driver of the pickup truck was negligent and, if so, whether such negligence was a proximate cause of the accident;
(4) What legal relationship existed between the owner, driver and passengers in the pickup? (Employee-employer; joint venture; or other relationship.)

*611 (5) Whether the trial judge erred in the awards of damages to the various parties.

I.
The first issue is whether Missouri Pacific and its engineer, Merle Browning, were negligent and, if so, whether such negligence was a proximate cause of the accident. The trial court rendered lengthy reasons for judgment and found these defendants negligent in "one or more of the following particulars:
"(1) In knowing of a hazard and doing nothing to ameliorate it in the form of warning to the motorist, or in the form of change of operating procedures to minimize risk.
"(2) Speed, not commensurate with the conditions in existence.
"(3) Warning by bell or whistle."
The record contains voluminous evidence concerning the nature of the crossing, including principally sight distances and view obstruction. The photographs and plats reveal that as the Guidry pickup truck approached the crossing, the driver's view of the track to his left was obstructed by houses, other buildings, trees and other growth. Located immediately adjacent to the railroad right of way, on the driver's left (the direction from which the train approached), are a house and a utility building. The house is situated on a lot that has trees across the rear and along the east side. Until a motorist clears these structures and trees, his visibility down the track is obstructed. The house is located approximately 50 feet from the track. The "sight distance" was discussed by experts from both sides who concluded that due to the obstructions this crossing only had approximately half of the clear "sight distance" required by the Bureau of Public Roads.
As early as 1969, the dangerous nature of this crossing was brought to the attention of the Highway Department and Missouri Pacific. Due to accidents occurring at the crossing, the St. Landry Parish Police Jury passed a resolution asking the parties concerned, the Highway Department and Missouri Pacific, to take steps to protect the public from the hazard.
Lawrence Harry, an engineer for the Highway Department, made a survey of the crossing in 1969 and found that the sight distances were less than minimum requirements. He calculated the hazard rating as 2.32, meaning that he projected that number of accidents to occur over a five-year period. He recommended that the crossing be equipped with flashing lights, warning bell and advance warning signs. Mr. Harry made another survey in 1973 with the same result.
Mr. Harry submitted his findings to Turner Lux, Jr., agreement engineer with the Highway Department. Lux sent the report and recommendations to Missouri Pacific in 1970. Missouri Pacific responded 2 years later, 1972, offering to install the signal equipment if the Highway Department would pay 90% of the costs. There was an exchange of communications between the Highway Department and Missouri Pacific, and finally in 1974 the Highway Department agreed to the 90%-10% cost contribution proposed, with the Highway Department paying 90%. The agreement between the Highway Department and Missouri Pacific was consummated in June, 1974. The installation took place in 1975, after the accident in question.
The railroad had knowledge of the need for automatic signals at this crossing for over 5 years before it installed same. This need was shown, not only by the surveys of the engineers but by the fact that William McClendon, claims man of Missouri Pacific, stated that 5 accidents occurred at this crossing between 1959 and 1974.
Automatic signals serve the same purpose as a whistle or bell on an approaching train. These devices all warn the motorist that impending danger exists as a train is approaching the crossing and is in the immediate vicinity of same. Under the unusual circumstances presented herein, the unreasonable delay in the railroad's installation of the safety devices was negligent and such negligence was a proximate cause of *612 the accident. We find no manifest error in the trial court's conclusion in this regard.
The trial court heard several witnesses who testified as to whether the engineer blew the whistle for the required distance of 300 yards before the accident. The train crew and some area witnesses testified that the whistle was blown before the accident as required. The occupants of the truck, witnesses to the accident and other parties near the scene testified that the whistle was not blown until the collision occurred or afterward. The trial court concluded that the whistle was not blown before the collision. The issue is factual and depends largely on the credibility of the witnesses. Under the rules of appellate review stated in Canter v. Koehring Co., 283 So.2d 716 (La.1973), we find no manifest error in the decision of the trial judge. The failure of the engineer, Merle Browning, in this regard was negligence and was a proximate cause of the accident. Bertrand v. Missouri Pacific Railroad Company, 160 So.2d 19 (La.App. 3rd Cir. 1964), writ refused 245 La. 1075, 162 So.2d 571 (1964). We do not feel that it is necessary to discuss in detail the speed of the train, having come to the above conclusions.

II.
We next examine the issue of whether the trial court erred in holding that the Highway Department was negligent which negligence was a proximate cause of the accident.
The duty of the Department of Highways to the traveling public is set forth in the case of Barnes v. Liberty Mutual Insurance Company, 350 So.2d 288 (La.App. 3rd Cir. 1977), writ refused 352 So.2d 239 (1977), wherein this court held as follows:
The law is settled that the Highway Department is not responsible for every accident which may occur on the state highways, nor is it a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from obstructions or defects in such highways. Standard Brands, Inc. v. Department of Highways, State of Louisiana, et al., 339 So.2d 780 (La.1976); Wilkinson v. American Insurance Company, 311 So.2d 584 (La.App. 3rd Cir. 1975); Doucet v. State, Department of Highways, 309 So.2d 382 (La.App. 3rd Cir. 1975), writs refused; Laborde v. Louisiana Department of Highways, 300 So.2d 579 (La.App. 3rd Cir. 1974), writ refused 303 So.2d 182 (La.1974).
As the Supreme Court stated in Standard Brands, Inc., supra:
"In order to hold the Department of Highways liable for an accident caused by an unsafe or hazardous condition it must be shown that the Highway Department had prior notice, either actual or constructive, of the dangerous condition and had sufficient opportunity to remedy same or at least to alert and warn motorists of its presence and failed to do so. Coleman v. Houp, 319 So.2d 831 (La.App. 3rd Cir. 1975)."
[3] The test for deciding whether there was an unsafe or hazardous condition is whether or not the highway was maintained in a reasonably safe condition for persons exercising ordinary care and prudence. Jones v. Louisiana Department of Highways, 338 So.2d 338 (La.App. 3rd Cir. 1976); Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975); Wilkinson v. American Insurance Company of Newark, N. J., 311 So.2d 584 (La. App. 3rd Cir. 1975).
In connection with the liability of the railroad, we have discussed the sequence of events that led up to the installation of the automatic signaling devices which were installed after the accident. As early as August 1973 the Highway Department agreement man had authority to accept Missouri Pacific's prior offer of 90%-10% participation in costs. The acceptance wasn't communicated to Missouri Pacific until January 1974. The agreement wasn't prepared and entered into until June 1974. The explanation given for the unusual delays was that the agreement office personnel were busy with other work. We have examined the testimony of the Highway Department personnel and conclude that in view of the risk *613 to the public that was involved, the cost of the installation (approximately $25,000.00), and the knowledge by the Highway Department of this dangerous condition, the delay was unjustified.
We conclude that under the particular and unusual circumstances presented, the trial court was correct in its conclusion that the Highway Department had violated its duty to the public and such was negligence that was a proximate cause of the accident.

III.
We next turn to the issue of whether the driver of the pickup was negligent and if so whether such negligence was a proximate cause of the accident.
The trial court concluded that the driver was contributorily negligent and the suit on his behalf was dismissed. A large portion of this voluminous record concerned sight distances, that is, the view that a motorist may have down the track as he approaches same. We have previously discussed the obstructions of view which existed at the time of this accident. We have determined that this was an unusually dangerous crossing but was not a dangerous "trap" such as would exonerate the driver under the circumstances presented. The "dangerous trap" doctrine was discussed by this court in the case of Bertrand v. Missouri Pacific Railroad Company, supra, wherein this court held as follows:
[1] The first issue which we will consider is whether this case falls within the "dangerous trap" doctrine as set forth in Renz v. Texas & Pacific Railway Company, La.App., 138 So.2d 114 (3rd Cir. App. 1962), Simon v. Texas & New Orleans Railroad Company, 124 So.2d 646 (3rd Cir. App. 1960) and McFarland v. Illinois Central Railroad Company, La.App., 122 So.2d 845 (1st Cir. App. 1960). In the recent case of Glisson v. Missouri Pacific Railroad Company, La.App., 158 So.2d 875 (3rd Cir. App. 1963) this court summarized the dangerous trap doctrine as follows:
"Succinctly stated, these cases, and the authorities cited therein, hold that if a crossing is unusually dangerous because the view of the motorist is so obstructed as to require that he place himself in a position of peril dangerously near the tracks, before he has a view of the oncoming train, the railroad company will be held liable, unless it can show that it took unusual precautions, such as reducing the speed of the train, or increasing its warnings or providing signaling devices, etc. The theory of this doctrine is that the railroad may not rely upon the duty of the motorist to stop and look, if the physical circumstances are such that stopping and looking will do the motorist no good."
In the Glisson case, which involved a rural crossing, we held the dangerous trap doctrine did not apply where the motorist, from a position at the stop sign 48 feet from the railroad track, had an unobstructed view of the tracks for a distance of 380 feet and a partially obstructed view for a distance of at least 600 feet.
In the present case, the driver of the pickup, from a distance of approximately 45 to 50 feet from the track, had a view of approximately 300 feet down the track. At approximately 20 to 25 feet from the track he had a clear view down the track. Having concluded that the "dangerous trap" doctrine of Glisson is not applicable to the driver, Phillip Guidry, it is readily apparent that Phillip was guilty of contributory negligence.
The evidence reflects that he was driving the truck at a speed of approximately 25 miles per hour as he entered the crossing. He did not slow for the tracks. He proceeded directly into the path of the oncoming train. In Bertrand, supra, this court set forth the duties of a motorist approaching a railroad crossing as follows:
". . . In Glisson v. Missouri Pacific Railroad Company, supra, we stated the following as regards the duty of a motorist approaching a railroad crossing:
`The general rule of law is that a motorist approaching a railroad crossing *614 must use his senses of sight and hearing for possible oncoming trains, before traversing the crossing. Tucker v. Illinois Central Railroad Company, 141 La. 1096, 76 So. 212; Rachal v. Texas & Pacific Railway Company, La. App., 61 So.2d 525; Matthews v. New Orleans Terminal Company, La.App., 45 So.2d 547. A motorist negotiating a railroad crossing is burdened with the responsibility of seeing and hearing that which he could have seen and heard, and he is presumed in law to have seen and heard what he could have seen and heard. Jackson v. Cook, 189 La. 860, 181 So. 195. If the motorist's view of the right of way is obstructed, he must exercise a higher degree of caution. See Renz v. Texas & Pacific Railway Company [La.App.], 138 So.2d 114, and the authorities cited therein.
`As regards the statutory requirement that a motorist must bring his vehicle to a complete stop at a railroad crossing (LSA-R.S. 23:243) this court has held in Simon v. Texas & New Orleans Railroad Company, supra, as follows:
`"A motorist need not come to a complete stop before crossing a railroad provided the motorist has his automobile under such control as to be able to stop immediately and has exercised due care in looking and listening for an approaching train. See Robertson v. Missouri Pacific Railroad Co., La.App. 1936, 165 So. 527."'"
If Guidry had had his truck under proper control, as is required by the law above, and had he been keeping a proper lookout, he could have avoided the accident. Phillip was well acquainted with the crossing. He passed there several times a day as he lived in the area. We find no manifest error in the trial court's finding that the driver was guilty of contributory negligence.

IV.
We next turn to the issue of what legal relationship, if any, existed between the owner of the truck, Charles A. Guidry, Sr., his son Phillip (the driver) and the passengers at the time of the accident. This issue comes into focus because the Highway Department pleads that the persons in the truck were on a joint venture and the driver's negligence would be imputed to the passengers, barring recovery.
The trial judge held that the passengers were employees of Charles A. Guidry, Sr., Kevin Guidry, and Phillip Guidry. Having come to this conclusion, the trial court dismissed all suits against Charles A. Guidry, Sr., and Hartford on the ground that as employees, neither the passengers nor survivors could recover in tort, but would be relegated to workmen's compensation claims.
The undisputed facts show that Charles A. Guidry, Sr., and his sons, Kevin and Phillip, had a small business arrangement wherein they would buy produce to be sold from house to house. To sell the produce, Phillip would get his friends, the passengers in this accident, to sell the produce from house to house in area towns. The boys who sold for the Guidrys would be paid 10 cents for each dollar's worth of produce sold. The passengers would not share in the profits or losses, nor exercise any control in the operation other than selling from house to house. The four boys were together at the time of the accident for the purpose of peddling the produce for the Guidrys. We find no manifest error in the trial judge's finding that this was an employee relationship and the suits were properly dismissed as to Charles A. Guidry, Sr., and his liability insurer Hartford.
The Highway Department further contends that even though the passengers were barred from recovery against Charles A. Guidry, Sr. as a result of the employee relationship, that the Department's third party demand against Guidry and Hartford for contribution should be recognized, citing the case of Smith v. Southern Farm Bureau Casualty Insurance Company, 247 La. 695, 174 So.2d 122 (1965). That case held that although the wife had no right of action *615 against her husband, who was a joint tort feasor, the statutory bar against her proceeding against her husband did not bar the insurer of a joint tort feasor from obtaining contribution from the husband. The court stated that the wife had no right of action against the husband but a cause of action by the insurer of the joint tort feasor existed against the husband for contribution.
In this case LSA-R.S. 23:1166[1] provides that when an employee receives an injury in the course and scope of his employment, his exclusive remedy is for workmen's compensation. The cause of action in tort extinguished by this statute cannot be revived by a third party action demanding contribution from the employer. The third party demand of the Highway Department was correctly dismissed.

V.
The last issue is the amount of damages awarded in each case. Missouri Pacific contends that the awards are excessive and should be reduced. We will now consider the awards made to Wilfred Charles Hebert.
The trial court awarded $250,000.00 for physical and mental injuries suffered by this 17-year old plaintiff. The trial court divided this into $100,000.00 for physical injuries and $150,000.00 for mental injuries. Missouri Pacific acknowledges the serious injuries but contends that these items should be reduced to $100,000.00.
The evidence reflects that prior to the accident Hebert led the normal life of a 17-year old teenager. Dr. Blackburn described this boy's condition prior to the accident as follows:
"He was basically easy going. He didn't have the high level of irritability, tantrums, spells, etc. He was not particularly bright. He was relatively in a slow learner group in school and was (not) that enthused about school other than the fact that he liked the sports and participated in some, had a lot of friends, played in a little band, very much into music, handled his father's death better than most of his other siblings in the sense that his degree of overt emotion at the time was less but he was upset but he handled it better. He was not presenting behavioral or management problems. He wasn't requiring medication for nerves, tension, depression, etc. He was essentially a normal boy with a low normal IQ who worked hard and was prettyvery well involved in some instances in his physical ability as compensation for I am sure not being as bright as a lot of his peers."
Following the accident this young man received extensive medical treatment for multiple injuries and was seen and treated by seven physicians, incurring $47,199.67 medical expenses up to the time of trial. The medical testimony is voluminous, so we will summarize same as it would not serve a useful purpose to detail same in a protracted dissertation.
Following the accident, Hebert was hospitalized in a state of shock with extreme pain and serious injuries which consisted principally of various internal injuries, fracture of the left femur, S-1 joint separation, head injury, and fractured rib.
An operation was performed repairing the internal injuries and the fractures. He was immobilized by being placed in traction. He remained in traction until January 23rd at which time he was placed in a spica cast. He was allowed to go home on January 25, 1975. His pain was intense. He developed nausea and vomiting and he was hospitalized again on February 13, 1975, with weakness to the right arm and leg. This was due to pelvic injury. He *616 developed psychiatric problems while in the hospital and was seen by a psychiatrist who found that his emotional problem stemmed from his prolonged process of treatment, immobilization and intense pain. Hebert was discharged from the hospital on April 3, 1975. The cast was later removed and he was placed on crutches.
Hebert started school in September of 1975 while on crutches. On September 9, 1975, he had severe head pain and pain in the left side of the body. He had a sudden seizure which consisted of spasm of the muscles on the left side of the body. He was taken to the hospital where he remained until October 30, 1975. This problem was diagnosed as brain injury by a neurosurgeon who felt that the brain injury was permanent and the seizures would continue in the future. This brain injury also caused an impairment to Hebert's hand, in that his coordination therein was reduced.
The psychiatrist continued to see Hebert and, as the physician suggested, Hebert tried to return to work for Guidry in the latter part of 1975. He was unable to perform the work due to the back, leg and arm problems. Hebert developed hepatitis on September 4, 1976, due to multiple blood transfusions. He was hospitalized until September 23, 1976, when he was referred back to the psychiatrist.
Hebert was admitted to the psychiatric unit of the hospital on October 25, 1976 for post-traumatic neurosis, depression and anxiety. He remained hospitalized until December 23, 1976. He was again placed in the psychiatric unit for the period of January 14, 1977, until February 5, 1977. He was again hospitalized on February 21, 1977, for an overdose of drugs. He was diagnosed as depressed with suicidal tendencies. He remained hospitalized on this occasion for three days.
The treating physician felt that at the time of his deposition for trial Hebert's prognosis was poor or guarded at least. The psychiatrist stated that Hebert would need continuing psychiatric treatment and probably hospitalization.
Hebert has suffered extensively from the day of the accident up until the day of trial and will continue to do so for an indefinite time in the future. He has serious permanent residuals as a result of the injuries received in the accident. Under these circumstances we find no abuse of discretion by the trial court and this award will be affirmed. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977).
The trial court also awarded $87,200.00 for loss of wages. The trial court's reasons showed that this represents loss of future wages and loss of earning capacity.
The plaintiff called a job analysis expert, George L. Cranford, who testified that he had examined the medical reports and plaintiff's work history and concluded that Hebert was limited as to what work he could perform due to the injuries he received and the seizures he would be subjected to in the future. He also felt that due to the psychological problems Hebert faced, he would have a problem selling himself to an employer. He felt that Hebert's potential for employment in the manual labor field was reduced to 15% or 20%. He concluded that it would be extremely difficult for Hebert to get a job in the job market.
Also, Dr. W. P. Culbertson, Sr., an expert in economics, calculated actuarially the loss of earning capacity sustained by Hebert. He calculated the loss considering the annual wage of a carpenter's helper at $13,000.00. Using 7½% increase of wages, 6% discount rate, and 45-year life expectancy, the value of the salary was placed at $821,696.59. Also he likewise figured the value of a salary of a mechanic based on an annual salary of $5,904.00 and its value would be $373,176.66. The court awarded $87,200.00.
We realize that this type of loss cannot be computed with mathematical certainty. The actuarial expert's testimony, however, merits substantial consideration, to be weighed by the trial court along with all other circumstances which exist. A review of the extensive record leads us to the conclusion that the trial court was reasonable in this award and has committed no manifest error.
*617 The trial court awarded $18,000.00 to Hebert for future medical. We find that the prognosis of plaintiff's problems will require further medication, treatment and probably hospitalization. The award is reasonable under the circumstances. We find no manifest error by the trial court.
The plaintiff Wanda Hebert appealed from the trial court's denial of her claim for time lost from her job as supervisor for the Department of Welfare.
We have examined the record in this regard and find that the record amply supports the trial court in its conclusion.
For the reasons set forth herein, the judgment of the trial court is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] LSA-R.S. 23:1166 provides as follows:

"When an insurance company issues a policy of insurance to an employer covering claims for injuries to employees that may arise within the scope of the employer's business, the insurance company shall be estopped to deny liability on the grounds that the employment was not hazardous and during the period such insurance is in effect, claims for injuries occurring during such period by such employees against the employer or the insurance company shall be exclusively under the workmen's compensation act."