JjPEATROSS, J.
This appeal arises out of a fatal train accident which occurred at a railroad crossing in Rayville, Louisiana. Plaintiffs, James E. Plank and Becky Plank Marable, are the adult children of the decedent, Marie Plank,'who was killed when a train struck the rear portion of her car while she was stopped at a traffic light on a street intersecting the railroad tracks. Plaintiffs filed this wrongful death suit against the Town of Rayville (“Rayville”). After a bench trial, the trial court found Mrs. Plank 100 percent at fault for the accident and dismissed Plaintiffs’ suit with prejudice. Plaintiffs appeal, challenging the trial court’s finding of no liability on the part of Rayville and allocation of fault. The Town of Rayville has answered the appeal, asserting numerous alleged erroneous rulings on the part of the trial court. For the reasons stated herein, we affirm.

FACTS

The Accident

Louisiana Street in Rayville runs north and south and is perpendicular to Kansas City Southern (“KCS”) railroad tracks, which run east and west. On either side of the railroad tracks are streets which run parallel to the tracks, U.S. Highway 80 on the north and Benedette Street on the south. There is a traffic light on Louisiana Street at its intersection with Highway 80 on the north side of the tracks. The record reveals that there is enough room for two vehicles between the railroad tracks and Highway 80, provided the northernmost vehicle stops close to the traffic light. On December 9, 1996, at approximately 8:20 a.m., Mrs. Plank left the post office after gathering her employer’s mail and proceeded across the Louisiana Street crossing, coming to a stop behind another vehicle at the traffic light at Louisiana Street and Highway 80. The rear portion of her car cleared the | ^tracks, but remained in the “foul line[1],” which is the area on either side of the tracks that *1197 accommodates the width of the train engine.
There were approximately two to four feet between Mrs. Plank’s vehicle and the vehicle in front of her. Several witnesses testified that a person could walk between the two vehicles and others testified that Mrs. Plank had sufficient room to move her vehicle forward to avoid the collision. Mrs. Plank was very familiar with the crossing and had traversed it numerous times.
The train was traveling in a westerly direction at approximately 47 to 48 miles per hour. As the train approached Ray-ville, it passed through two other crossings before reaching the Louisiana Street crossing. As such, R.C. Lindsey, the train engineer, began blowing the train’s horn some distance before ever reaching the sign which alerts him to blow the horn for the Louisiana Street crossing. Mr. Lindsey testified that it was his usual practice to blow the train’s horn continuously while traveling through Rayville, and he did so on the day of the accident.
Mr. Lindsey testified that he saw Mrs. Plank and noted that she was looking straight ahead, in the direction of the traffic light. It was not until the train was approximately 24 feet from the crossing, however, that Mr. Lindsey realized that the train would not clear the rear of Mrs. Plank’s vehicle. At that point, Mr. Lindsey “put the train in emergency” in an attempt to avoid the collision. Mr. Lindsey also testified that he noticed a vehicle on the tracks, behind Mrs. Plank, which backed off the tracks as the train approached.
LThe vehicle behind Mrs. Plank was driven by Darnell Grayson. Mr. Grayson testified that he noticed that Mrs. Plank’s vehicle was going to be struck by the train and he pulled forward toward her vehicle, blowing his horn at her in an attempt to get her attention; however, she did not respond. As the train got closer, Mr. Grayson backed his vehicle to a position of safety and continued to blow his horn at Mrs. Plank. Apparently, Mrs. Plank remained unaware of the train and her proximity to the tracks and she made no effort to move her vehicle or to exit the vehicle to avoid being struck by the train.
According to expert testimony, approximately 27 seconds after coming to a stop at the intersection, the rear foot and one half to two feet of Mrs. Plank’s vehicle was struck by the train. The radio was not playing and the windows in Mrs. Plank’s vehicle were up. Immediately following the collision, Mrs. Plank stated that she did not see or hear the train. Mrs. Plank was transported to the hospital and died later that day.[2]
Kristie McDuffie testified that she was at the nearby post office that morning. She also testified that it was a clear morning and that, while walking into the post office, she noticed that the rear end of Mrs. Plank’s vehicle was partially in the foul line of the tracks. Ms. McDuffie further testified that there appeared to be room for forward movement of Mrs. Plank’s vehicle when she last saw it. She testified that the space between the vehicles was large enough for a person to walk through. Ms. McDuffie was familiar with the Louisiana Street crossing and testified that there were no visual obstructions of approaching trains to motorists as they approach and cross the tracks. Additionally, Ms. McDuffie testified that, once she was in the post office, she heard the train’s horn blowing continuously and also heard the train apply its brakes, but she did not see the accident.
|4Two eyewitnesses to the accident were Terry Thompson, who was working as an auxiliary police officer for the Town of Rayville, and Rayville Chief of Police Eddie Graham. Officer Thompson testified *1198 that, on the morning of the accident, he and Chief Graham were stopped at the traffic light at the intersection of Julia Street and Highway 80, which is a short distance from the Louisiana Street crossing. Officer Thompson testified that he saw the approaching train and noticed the vehicles stopped at the Louisiana Street crossing. He also noticed that the second vehicle’s rear bumper was very close to, or over, the tracks. Officer Thompson further testified that he saw the vehicle behind Mrs. Plank back up to avoid a collision with the train and that he also saw the train strike Mrs. Plank’s vehicle. According to Officer Thompson, approximately ten seconds elapsed between the time he heard the train’s horn and impact and approximately five seconds elapsed between the time he saw the train’s headlight and impact. Like Ms. McDuffie, Officer Thompson testified that there were approximately three to four feet between Mrs. Plank’s vehicle and the vehicle in front of her and that it would have been possible for her to pull forward or to the right or left to avoid the accident had she heard or seen the train. Officer Thompson had no difficulty seeing or hearing the train from his location, approximately two blocks west of the collision site. Chief Graham confirmed Officer Thompson’s testimony regarding the positioning of Mrs. Plank’s vehicle prior to the accident.

The Louisiana Street crossing

There are five railroad crossings in or around downtown Rayville. Three of those crossings are located in the downtown area: the Julia Street crossing, the Louisa Street crossing and the Louisiana Street crossing. The Julia Street crossing is equipped with lights and gates. The Louisa Street crossing, which is one block east of the Julia Street crossing, is also equipped with lights and gates. The Louisiana Street crossing is one block east of the Louisa Street crossing and is | smarked by a standard cross buck sign in the KCS right-of-way and a round yellow and black railroad crossing advanced warning sign on Louisiana Street; however, it is not equipped with lights or gates. The remaining two crossings are outside the downtown area and are also not equipped with lights or gates.
By letter dated October 17, 1995, A.R. Luman, Superintendent of KCS, informed Mayor Isam Berry that the speed of KCS trains traveling through Rayville would be increasing from 25 miles per hour to 49 miles per hour.[3] In response, Mayor Berry wrote a letter to Mr. Luman, dated October 25, 1995, requesting that KCS reconsider the speed increase because the change “would jeopardize the lives of those who operate vehicles, farm equipment, and other machinery in the Town of Rayville.” Mr. Luman then notified Mayor Berry by letter dated October 31, 1995, that KCS did not believe that the increased speed would jeopardize the citizens of Rayville, but that it may actually decrease the potential hazard at crossings so long as motorists exercised the degree of care required by law in crossing the tracks. Mr. Luman also stated that “the best way to avoid crossing accidents is to close unnecessary crossings and to see that the remaining crossings have proper warning signs and signalization.” He further indicated that KCS would work with Rayville in identifying such crossings.
Plaintiffs also introduced a letter dated March 11, 1996, written to the Town of Rayville by Thomas L. Payment, Maintenance Systems Engineer with the DOTD, recommending the closure of the Louisiana Street crossing. This recommendation was based, first, on the fact that the estimated traffic using the crossing was 200 vehicles per day, which, in Mr. Payment’s *1199 opinion, could easily be diverted to adjacent crossings that were adequately equipped with warning | (¡devices (the Julia and Louisa Streets crossings). Second, Mr. Payment noted that the closure would be consistent with the national action plan supported by the Federal Highway Administration, Federal Railroad Administration and DOTD to enhance public safety through railroad grade crossing closures and consolidations.
After receiving Mr. Payment’s letter, Mayor Berry temporarily closed the Louisiana Street crossing on or about March 18, 1996. Mayor Berry testified, however, that he did not have the authority to permanently close the crossing. Such action required a vote of the town council. On March 26, 1996, at a meeting called to consider the closure of the Louisiana Street crossing, the Rayville Board of Aldermen voted to reopen the crossing. The safety of the crossing was not addressed, rather, the town council cited the crossing’s utility for accommodating farm equipment and machinery as a primary reason for reopening it. The record indicates that the Louisiana Street crossing has a lower grade than the Julia Street or Louisa Street crossings, which are “humped,” making it difficult for tractors, or “low boys,” and other farm equipment and machinery to pass over those crossings. This type of traffic usually uses the Louisiana Street crossing exclusively in order to avoid being “hung up” on the tracks, which requires emergency vehicles to come to the scene to remove them from the tracks. Additionally, Mayor Berry had apparently been receiving complaints regarding the closure of the crossing, including that the congestion on nearby streets was unmanageable. Assistant Chief of Police Thomas Nicholson testified that the closure of the Louisiana Street crossing created confusion for motorists.
On March 27, 1996, Mayor Berry wrote a letter to Mr. Payment notifying him that the Louisiana Street crossing would remain open as it was necessary for the smooth flow of traffic in Rayville. Mayor Berry requested that DOTD and KCS consider placing automatic crossing arms at the crossing. DOTD did not respond and no further action was taken regarding the Louisiana Street crossing.
|7Mayor Berry testified that the Louisiana Street crossing has remained unchanged for as long as he could remember. He further testified that a motorist approaching the crossing from any direction can easily see east and west without any obstructions. Despite his letter to Mr. Luman regarding the speed of the trains, Mayor Berry testified that he never considered the Louisiana Street crossing to be a dangerous crossing. Additionally, May- or Berry testified that the crossing is widely used by residents due to its close proximity to City Hall and the post office. He disagreed with the traffic estimate of 200 vehicles per day, as stated in Mr. Payment’s letter, and did not understand that letter to be a declaration that the crossing was dangerous. According to Mayor Berry, Rayville could not unilaterally decide to install lights and other warning devices; and he testified that he had asked DOTD and KCS to consider that option. Finally, the record clearly establishes that the current signalization at the Louisiana Street crossing meets all highway and railroad regulations, including the Manual of Uniform Traffic Control Devices.

Expert Testimony

Plaintiffs’ expert witness, Dr. John C. Glennon, was accepted by the trial court as an expert in highway design, safety, traffic engineering, accident reconstruction and human factors.[4] Dr. Glennon testified that *1200 the Louisiana Street crossing was hazardous for several reasons, including sight restrictions caused by the crossing’s close proximity to Highway 80 and Benedette Street. There is also a sight restriction due to the post office building on the west side of Louisiana Street and the compress building and vegetation on the east side of the street. He did | Radmit, however, that a motorist parked in the position of Mrs. Plank’s vehicle would have no difficulty in seeing a train approaching from the east.
Dr. Glennon opined that the position of the traffic light at the intersection of Louisiana Street and Highway 80 causes the crossing to be hazardous as well. In his opinion, a stop sign, rather than a traffic light, would be safer at this intersection. Additionally, faster train speeds make the crossing more hazardous. Dr. Glennon further opined that motorists would benefit from a “Do Not Stop on Tracks” sign at this crossing and that this was only one of several options that Rayville could have utilized to avoid an accident of this nature. Among the other options, Dr. Glennon noted closing the crossing, the installation of a painted line on Louisiana Street south of the railroad tracks indicating to motorists where to stop, the repositioning of the traffic light and increasing the “green light” time of the traffic light for northbound Louisiana Street' motorists. He also suggested the installation of lights and gates and a triggering device for the traffic light which would provide a green light when a train is coming to allow motorists to safely cross before the arrival of the train. Dr. Glennon agreed, however, that the crossing was in compliance with all mandated warning and safety requirements and that none of his suggestions were required by any applicable federal or highway regulation.
Regarding the accident itself, Dr. Glen-non testified that the train was approximately 2,600 feet from the crossing when Mrs. Plank looked to the right to see if she could safely cross the tracks. In his opinion, she was not negligent in proceeding across the tracks. Based on his reconstruction figures, Dr. Glennon further testified that, if Mrs. Plank had determined her peril five seconds before impact, she could have moved her vehicle two feet forward and avoided the collision.
| ^Finally, Dr. Glennon acknowledged the utility of the crossing and lack of previous accidents. He conceded that the actual traffic count using this crossing was actually 1,000 to 1,200 vehicles per day.
Mr. Ed Cheek, a traffic engineer for the City of Monroe, testified on behalf of Ray-ville. Mr. Cheek agreed with Dr. Glen-non’s traffic count; and, while he opined that there were problems at the crossing due to the parallel roadways, he stated that it was reasonably safe for a prudent motorist.

ACTION OF THE TRIAL COURT

Plaintiffs allege that Rayville was negligent by (1) failing to follow DOTD’s recommendation that the Louisiana Street crossing be closed; (2) failing to close the crossing until lighted signaling devices and gates were installed; (3) failing to install a “Do Not Stop on Tracks” sign; and/or (4) failing to implement pavement and other markings requiring that traffic stop on the south side of the railroad tracks when the traffic light at Highway 80 and Louisiana Street is red for northbound traffic. In a well-written and well-reasoned opinion, the trial judge found that “Mrs. Plank could have and should have seen and heard the train and moved her car a sufficient distance to avoid a collision or at least removed herself from the vehicle.” Her failure to do either, in the trial judge’s opinion, was the legal cause of her death.
Utilizing the standard set forth by this court in Fry v. Southern Pacific Transportation Co., 30,540 (La.App.2d Cir.6/24/98), 715 So.2d 632, the trial judge first determined that the crossing was not unreason *1201 ably dangerous for an approaching motorist exercising ordinary care and prudence; therefore, the trial judge found no negligence on the part of Rayville as to sight restrictions and signage. Next, the trial judge found that Rayville did have knowledge that this crossing posed a danger to motorists under certain conditions and yet failed to exercise a reasonable effort to implement additional safety features. Finally, 1 inhowever, the trial judge found that the lack of such additional safety features was not a legal cause of the accident.
Regarding the liability of KCS, the trial judge concluded that, while the increased “speed of the train may have had a speculative but not substantial impact on this accident, it was not the cause-in-fact or legal cause of the accident.” Likewise, the trial judge concluded that DOTD should have conducted an investigation or study regarding the traffic light at this crossing and should have considered Mayor Berry’s request for additional warning signals at the crossing; however, the trial judge found that these failures on the part of DOTD were not the cause of the accident.
As previously stated, the trial judge assessed 100 percent fault to Mrs. Plank and dismissed Plaintiffs’ suit.

DISCUSSION

Liability of Rayville

Plaintiffs challenge the trial judge’s determination that Rayville was not liable for the accident which resulted in Mrs. Plank’s death. Plaintiffs argue that the Louisiana Street crossing was unreasonably dangerous and that Rayville had actual notice of the hazardous condition of the crossing, as evidenced by the correspondence exchanged among Mayor Berry, KCS and DOTD. Plaintiffs submit that it was negligent for Rayville to allow 13 months to pass between the time Mayor Berry wrote to KCS regarding the increased speed of the trains and the time Mrs. Plank was killed without taking any action with regard to the crossing. Plaintiffs also discuss at length the testimony of Dr. Glennon regarding the options available to Rayville to remove or reduce the hazard which they claim existed at the Louisiana Street crossing.
In order to decide the liability of a governing authority for accidents occurring on railroad crossings, the trial court must determine whether (1) the Incrossing was unreasonably dangerous; (2) the governing authority had knowledge of the condition yet failed to exercise a reasonable chance to remedy that condition; and (8) that the unreasonably dangerous condition caused the accident. Fry, supra. First, careful review of the evidence suggests nothing to indicate that the Louisiana Street crossing was unreasonably dangerous at the time of the accident. Second, while Rayville may have had knowledge that the crossing posed a hazard to motorists under certain conditions, we do not believe that Rayville was on notice of any unreasonably dangerous condition existing at the crossing at the time of Mrs. Plank’s accident. Third, as discussed infra, we find no error in the trial judge’s conclusion that any negligent conduct on the part of Rayville was not the cause of this accident.
The hallmark for determining whether a crossing is unreasonably dangerous is. whether it is maintained in a reasonably safe condition for persons exercising ordinary care and prudence. Highlands Ins. Co. v. Missouri Pacific Railroad Co., 532 So.2d 317 (La.App. 3d Cir.1988); Hebert v. Missouri Railroad Co., 366 So.2d 608 (La.App. 3d Cir.1978), writ denied, 369 So.2d 153 (La.1979). There are a myriad of conditions which may contribute to the unreasonably dangerous condition of a railroad crossing including, but certainly not limited to, sight obstructions such as vegetation and buildings, parallel roadways and inadequate warning devices or signalization. Every railroad crossing has its own particular dynamics which may include one or more hazards. The presence of such hazards does not, however, *1202 automatically mean, in the legal sense, that a certain crossing is unreasonably dangerous to motorists exercising ordinary care and prudence.
Dr. Glennon cited hazards which, in his opinion, rendered the Louisiana Street crossing unreasonably dangerous. Significantly, however, despite the hazards noted by Dr. Glennon, the record reveals no similar accidents ever having | ^occurred at this crossing. Additionally, we find it significant that Mr. Cheek, testifying on behalf of Rayville, agreed with many of Dr. Glennon’s findings, but opined that the crossing was safe/or a motorist exercising ordinary prudence. There is no question that the existence of a parallel street and the positioning of the traffic light at Louisiana Street and Highway 80 may be hazards to motorists using this crossing. These conditions, however, have been present and have remained virtually unchanged for many years at this particular crossing; and, as previously stated, there have been no similar accidents.
Since we conclude that the crossing was not unreasonably dangerous, we do not believe it necessary to continue with the Fry analysis. We will, however, briefly discuss the issues of notice and cause. Regarding notice, Plaintiffs rely on the correspondence described earlier to suggest that Mayor Berry and, therefore, Rayville, was on notice of the unreasonably dangerous condition of the Louisiana Street crossing. After close scrutiny of each of the letters, however, we can find no reference to the “unreasonably dangerous condition” of this crossing. Certainly Mayor Berry expressed concern regarding the increase in the speed of trains through Rayville—a concern relevant to each and every crossing in town. Nothing in his letter to Mr. Luman of KCS, however, indicates a belief that the Louisiana Street crossing is unreasonably dangerous. Mr. Luman’s response suggests the closure of “unnecessary” crossings as an effort to enhance crossing safety. We are satisfied that the Louisiana Street crossing was necessary and find nothing in that letter to suggest that this crossing in particular is unreasonably dangerous. Finally, Mr. Payment’s letter to Mayor Berry suggesting the closure of the Louisiana Street crossing relies on incorrect data regarding the traffic count at this crossing, which suggests that the recommendation was founded on the mistaken belief that the crossing was unnecessary. Even if Mr. Payment’s recommendation was partly based on a safety evaluation of the crossing, there is no information in this letter to |13alert Mayor Berry to any specific safety concerns or unreasonably dangerous conditions existing at this crossing. Admittedly, hazards did exist at this crossing; however, there is simply no evidence that Rayville had knowledge of any unreason- ' ably dangerous condition which would require remedial action.
’We also recognize that certain measures could have been employed at this crossing to enhance its overall safety, including closing the crossing or installing additional warning devices or signs. While closure of a crossing will certainly diminish the number of accidents occurring at a particular crossing, the Louisiana Street crossing was necessary for the smooth flow of traffic through Rayville and was essential for the transporting of heavy farm machinery and equipment due to the crossing’s low grade. At a specially called meeting, the Board of Aldermen of Ray-ville recognized the utility of the crossing and voted to allow the crossing to remain open. Moreover, since there had been no previous complaints regarding the allegedly hazardous condition of the crossing, safety concerns were not even addressed at the meeting.
Furthermore, while it is always true that added warning devices, signs or markings may improve the safety of a given railroad crossing and would likely have enhanced the safety of the Louisiana Street crossing, we cannot say that Ray-ville was negligent in not installing such *1203 devices at this particular crossing. The uncontroverted testimony of several witnesses established that the warning devices present at the crossing were in compliance with the Manual of Uniform Traffic Control Devices. Compliance with the manual constitutes prima, facie proof of the adequacy of the devices, as well as the absence of negligence on the part of the road authority. Reichert v. State, Through Dept. of Trans. & Dev., 96-1419 (La.5/20/97), 694 So.2d 193; Fry, supra. Even if we were to find that Rayville should have installed such additional safety measures, we cannot say that |14the trial judge was clearly wrong in concluding that the lack of such devices was the cause of Mrs. Plank’s accident.[5]
On this record, therefore, we find no error in the trial judge’s determination that the Louisiana Street crossing was not unreasonably dangerous for motorists exercising ordinary care and prudence. We further find that, while it may have known of hazards existing at this and other crossings in town, Rayville did not have knowledge of any unreasonably dangerous condition at the Louisiana Street crossing. Finally, even assuming arguendo that the crossing was unreasonably dangerous and that Rayville had knowledge of a dangerous condition, we agree with the trial judge that the lack of additional safety precautions at this crossing was not the cause of the accident which resulted in the death of Mrs. Plank.

Apportionment of Fault

Plaintiffs argue that, in apportioning fault, the trial judge erroneously applied the doctrine of last clear chance, finding that Mrs. Plank was the sole cause of her accident. Plaintiffs assert that the trial judge’s conclusion that Mrs. Plank “had the last clear chance to remove herself from harms way,” is contrary to the mandatory language in La. C.C. art. 2323(A) which sets forth the principles of comparative fault. When viewed in its entirety, however, it is clear that the trial judge’s ruling properly applies the principles of comparative fault and correctly assesses 100 percent of the fault for this accident to Mrs. Plank.
11 [¡Initially, we must determine whether the trial judge erred in finding that Mrs. Plank was liable at all for the accident. In general, a motorist has a duty to maintain reasonable and proper control of his/her vehicle at all times. That duty is increased when a motorist approaches a railroad crossing. The motorist must use his/her senses of sight and hearing for possible approaching trains. A motorist traversing a railroad crossing is presumed to have heard and seen what he/she “could have heard and seen.” Rivere v. Union Pacific Railroad Co., 93-1132 (La.App. 1st Cir.10/7/94), 647 So.2d 1140, unit denied, 95-0292 (La.3/24/95), 651 So.2d 295.
Additionally, the law provides that a motorist shall not stop a motor vehicle upon any railroad crossing. La. R.S. 32:175. Furthermore, a motorist approaching a railroad grade crossing equipped with only a railroad cross buck sign is required to yield the right of way to oncoming trains. *1204 La. R.S. 32:171(E) and 32:175(A). La. R.S. 32:171(E) states, in pertinent part:
If a driver is involved in a collision at a railroad crossing or interferes with the movement of a train after driving past the railroad cross buck sign, the collision or interference is prima facie evidence of the driver’s failure to yield the right of way.
Mrs. Plank was clearly in violation of the law by stopping her vehicle within the foul line of the railroad tracks. The evidence reveals that Mrs. Plank was looking straight ahead and simply did not hear the train’s whistle blowing or Mr. Grayson’s horn blowing directly behind her. There was testimony that Mrs. Plank’s hearing was not impaired and that, while she wore glasses to assist her sight, she was not significantly impaired in that respect. Officer Thompson and Chief Graham, who were two blocks west of the Louisiana Street crossing, clearly heard the train’s whistle. Mr. Grayson, who was directly behind Mrs. Plank, saw and heard the train approaching. Ms. McDuffie also heard the train whistle from inside the nearby post office. There were no sight obstructions |1fifrom the position of Mrs. Plank’s vehicle. Moreover, Mrs. Plank was familiar with this crossing and had traversed it frequently. We conclude, as did the trial judge, that Mrs. Plank failed to exercise the heightened degree of care required of motorists approaching and crossing railroad grade crossings by stopping her vehicle in a position of peril, with the rear of her vehicle within the foul line of the train’s engine. Mrs. Plank’s inattentiveness caused her to fail to see or hear the approaching train or Mr. Gray-son’s attempts to alert her and, ultimately, caused her failure to yield the right of way to the train. Since we find that Mrs. Plank was negligent in causing the accident, we now address the apportionment of fault among Mrs. Plank and third parties.
The factors which should be considered in apportioning fault were outlined by the supreme court in Watson v. State Farm Fire and Casualty Insurance, 469 So.2d 967 (La.1985):
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
In the case sub judice, the trial judge also relied upon the factually similar case of Lee v. Missouri Pacific Railroad Co., 566 So.2d 1052 (La.App. 2d Cir.1990), in which a panel of this court found a motorist to be the sole cause of the accident which resulted in his death when he parked his vehicle directly on the railroad tracks and was struck by a train. In Lee, we explained our reasoning as follows:
After careful and thorough review of the record, we are convinced that plaintiffs have failed to show that any of the complained of actions or failures to act by the defendants in any way caused this accident. The uncontradicted evidence in this case is that Roger Lee, for some unknown reason chose or happened to stop hisJjjvehicle directly in the middle of MoPAC’s grade crossing at Stubbs-Vincent Road. In the face of an approaching locomotive, he did not attempt to remove his vehicle from the crossing nor himself from the vehicle. There was no obstruction preventing him from viewing the locomotive from the position at which he stopped. The engineer blew his horn repeatedly to no avail. The light of the engine shined *1205 directly onto Lee’s automobile. Yet, Roger Lee did nothing.
Had additional bells or lights been erected at this crossing, there is no evidence that Roger Lee would not have been stopped on the crossing before they activated. Furthermore, no warning could have alerted Lee to any greater danger than the locomotive itself did as it approached him on this tragic morning. This evidence overwhelmingly convinces us that the sole cause of the accident was Lee’s stopping his vehicle directly on the grade crossing, a violation of the law. LSA-R.S. 32:17(B). Lee took no evasive action as the train approached him and by the time the engineer saw the stopped vehicle it was impossible to bring the more than one-mile-long train to a halt. We therefore are compelled to affirm the judgment of the trial court.
Applying the above jurisprudence to the present case, the trial judge stated:
... the accident resulted solely from Mrs. Plank’s inattentiveness and her failure to heed the visible and audible warnings of the impending collision; her positioning her vehicle within the “foul line” of the KCS train; her superior position compared to that of the Town of Rayville, DOTD and KCS to avoid this accident; and the fact that given all the warnings and the time and space available to her to escape, she had the last clear chance to remove herself from harm’s way.
It is clear from the trial judge’s reasons for judgment that he properly applied the principles of comparative fault in assessing the fault for this accident, including the consideration that Mrs. Plank could have, but did not, take any evasive action. We do not find error in the trial judge’s consideration of Mrs. Plank’s ability and failure to remove herself from the danger which ultimately resulted in her death.
Consideration of the factors enunciated in Watson, supra, is the task of the factfinder and, as such, so is the allocation of shares of negligence. Since application of the factors necessarily involve factual considerations, the manifest error/clearly wrong standard applies. Socorro v. City of New Orleans, 579 So.2d 931 (La.1991). The record is replete with testimony that Mrs. Plank had sufficient room to move her vehicle forward or to the left or right to avoid the collision had |1sshe seen or heard the approaching train. Even if that were not the case, Mrs. Plank had sufficient time to exit her vehicle to avoid being involved in the accident. Faced with this evidence, we agree with the trial judge that Mrs. Plank’s innattentiveness was the sole cause of her unfortunate accident.
In so finding, we also agree with the trial judge’s decision that no fault for this accident should be assessed to any third party.[6] First, as previously discussed, we find that the trial judge properly concluded that Rayville has no liability for the accident and, therefore, was assessed no fault. Second, regarding KCS, we cannot say that the trial judge’s determination that the railroad was not liable for the accident was manifestly erroneous. There is simply no evidence of record to support any liability on the part of KCS. The testimony of Mr. Lindsey is uncontroverted that, as soon as he realized that Mrs. Plank’s vehicle was not clear of the tracks, he applied the train’s emergency brakes. Unfortunately, there was nothing more Mr. Lindsey could do at that point to avoid the collision. Furthermore, we note that' the speed of the train, while arguably presenting a danger at 47 to 48 miles per hour, was within the federally mandated speed limit for the train to be traveling through Rayville. Finally, we find no evi *1206 dence in the record to support a finding of liability on the part of DOTD in this case. While it may have been prudent for DOTD to follow up with Mayor Berry regarding the recommendation to close the Louisiana Street crossing if, in fact, DOTD believed it to be a dangerous crossing, no act or failure to act on its part can be viewed as a cause of Mrs. Plank’s unfortunate accident.

\icjtayville’s Answer to Appeal

In its answer to the appeal, Rayville asserts numerous alleged evidentiary errors on the part of the trial judge. Since we find no error in the trial judge’s finding it not liable for Mrs. Plank’s accident, we pretermit any discussion of the assignments raised by Rayville as they would not effect the outcome of this appeal. See footnote number 1, supra.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed. All costs are assessed to Plaintiffs, James E. Plank and Becky Plank Marable.
AFFIRMED.

. A train is wider than the actual railroad tracks, from rail to rail. Dr. Glennon testified that the term ''crossing” includes the area over which the train passes on the railroad tracks, which area is referred to as the "foul line.” The foul line includes the five fool width of the actual tracks plus two and three-fourths feet on both sides of the tracks to accommodate the train’s width.

. We note that Plaintiffs have also filed suit against the hospital for the wrongful death of their mother.

. The propriety of the trial court’s ruling admitting this and other correspondence into evidence is challenged in Rayville's answer to the appeal. Since we find, however, that the trial court was not manifestly erroneous in finding that Rayville had no liability for the accident which caused Mrs. Plank’s death, we pretermit any discussion of the admissibility of such correspondence.

. According to Dr. Glennon, human factors is the study of how people interact with machines and their environment. This includes how a person is distributed in size, what his/her eye height might be in an automobile and what his/her perception reaction time is and how it varies. Human factors also deals with road signs and how quickly the messages portrayed by signs are grasped by a driver *1200 and driver reaction to other traffic control devices.

. The trial judge found that the condition of the crossing and any scenarios in which he could envision the accident being avoided by the installation of additional safety measures or repositioning of the traffic light were, at best, speculative and not substantial causes of the accident. We note that most of the options suggested for improving the safety of this crossing would require the cooperation of KCS and DOTD. As the governing authority, Rayville only had the power to close the crossing altogether or to erect a "Do Not Stop on Tracks” sign and paint additional markings on the pavement. As discussed, we do not believe that closure of the crossing was warranted. Likewise, a "Do Not Stop on Tracks” sign and additional pavement markings are not required by the Manual of Uniform Traffic Control Devices at this particular crossing and, as both experts admitted, may not always be respected and obeyed by motorists. We, therefore, agree with the trial judge that any negligence in not taking such additional measures at the Louisiana Street crossing had only a speculative impact on this accident.

. We note that Rayville filed a third party demand against KCS and DOTD, which was dismissed on subsequent exceptions of no cause of action due to the trial judge’s finding of no solidarity of obligation. In his ruling, however, the trial judge stated that the allocation of fault for Mrs. Plank's accident would include a consideration of these parties.